**In re Matter of Stephen YAGMAN, Appellant,**

**Jerry BROWN and Gerry Fleischer, Plaintiffs-Appellants,**

**v.**

**Michael BADEN and Sidney Weinberg, Defendants-Appellees.**

**Nos. 84–5839, 84–5957.**

United States Court of Appeals, Ninth Circuit.

Argued Feb. 7, 1986.

Submitted Feb. 21, 1986.

Decided Aug. 13, 1986.

Stephen Yagman, Yagman & Yagman, P.C., Los Angeles, Cal., for plaintiffs-appellants in No. 84–5839.

Ramsey Clark, Weldon Brewer and Lawrence W. Schilling, New York City, for Yagman in No. 84–5957.

Harry Schneider, Woodland Hills, Cal., Anthony A. De Corso, Mark E. Beck, Los Angeles, Cal., for defendants-appellees.

Before ANDERSON, PREGERSON and WIGGINS, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Plaintiffs Jerry Brown and Gerry Fleischer appeal from the district court's grant of a directed verdict upon the motion of defendants Michael Baden and Sidney Weinberg. Plaintiffs' counsel, Stephen Yagman, appeals from the district court's imposition of sanctions against him individually and against his professional corporation. We affirm the directed verdict and reverse the order of sanctions.

### BACKGROUND

On June 2, 1981, in Signal Hill, California, Signal Hill police officer Jerry Brown arrested Reginald Ronell Settles, a football

star at nearby California State University at Long Beach. While attempting to book Settles at the Signal Hill station, a scuffle took place between Brown and Settles. Police cadet Gerry Fleischer came to Brown's aid and helped subdue Settles. Brown then finished the booking procedure and Settles was taken to a holding cell. About one hour later, Settles was found dead in his cell, hanging by the neck from a mattress cover which had been looped over the cell's door jam.

The death and subsequent events were extensively publicized in the local media. An autopsy conducted by the Los Angeles County Coroner's office, which found multiple traumatic injuries on the body, including hemorrhaging of the esophagus, resulted in a determination that the cause of death was suicidal hanging. Because of continued media controversy and public dissatisfaction, however, Coroner Thomas Noguchi empaneled a coroner's jury. In September, 1981, the jury decided, by a vote of five to four, that the death was caused by another person or persons. Noguchi did not change his decision as to the cause of death after receiving this advisory verdict.

The Los Angeles County District Attorney conducted a criminal grand jury investigation of Settles' death from June 3, 1981 to January 8, 1982. On January 8, 1982, the District Attorney announced that the investigation had not developed sufficient evidence to warrant criminal charges, but that if any new information came to his attention, he would go forward with additional investigation. (Reporter's Transcript, March 20, 1984, p. 27). Shortly before this announcement, in December, 1981, the Settles family filed a civil action against Brown, Fleischer, and the City of Signal Hill and its officials, seeking damages for Reginald Settles' death. Attorney Stephen Yagman represented Brown in defense of this civil action.

In early 1982, the Settles family decided that a second autopsy of the body was needed. Dr. Sidney Weinberg, the Medical Examiner of Suffolk County, New York, and Dr. Michael Baden, Weinberg's deputy, agreed to conduct the re-autopsy for no fee. (Reporter's Transcript, March 22, 1984, p. 10). The re-autopsy was conducted on March 24, 1982 in the Suffolk County autopsy facilities, which the Settles family rented from the county for a fee of $500.00. In addition to Weinberg and Baden, the re-autopsy was attended by Dr. Werner Spitz, who was retained by the City of Signal Hill, Dr. Noguchi, representing the Los Angeles County Coroner's office, Los Angeles County Deputy District Attorney Gilbert Garcetti, and attorneys representing the various parties.

Three months later, on June 26, 1982, the doctors gathered in Suffolk County to discuss the re-autopsy. An initial meeting was held in Dr. Weinberg's office, attended by doctors Weinberg, Baden, Spitz, and Noguchi, two attorneys representing the Settles family, Deputy District Attorney Garcetti, Signal Hill attorney Inlow Campbell, and, for a brief period, attorney Stephen Yagman. At the meeting, each of the four doctors spoke in turn about the findings of the re-autopsy and the cause of death. Following the meeting in Dr. Weinberg's office, the doctors held a press conference where they again spoke individually about the results of the re-autopsy and the cause of death. Various representatives of the news media (including national television) were present.

On July 1, 1982, Brown and Fleischer (plaintiffs), represented by Stephen Yagman (Yagman), filed a diversity action in United States District Court alleging that they had been defamed by Weinberg and Baden (defendants) during both the private meeting in Weinberg's office and the press conference. The case was calendared before District Judge Lawrence T. Lydick and progressed toward trial for nearly two years. During this time, Judge Lydick ruled on numerous motions, including several for summary judgment, to compel discovery, and for sanctions. On March 14, 1984, six days before the scheduled trial date, the action was transferred to Chief Judge Manuel L. Real.

As scheduled, the parties met on March 20, 1984, in front of Judge Real. Due to court calendar conflicts, trial was reset to begin April 3, 1984, with no objections. Judge Real used available time on March 20 and 22 to hear evidence and argument on the choice of law issue, eventually ruling that California law would be applied.

The action was tried on April 3–5, 1984. During the course of the trial, Judge Real made several rulings about which plaintiffs complain. For example, the court ordered opening statements to be made to the entire prospective jury panel before the jury voir dire was conducted. Also, the court ordered plaintiffs to put on evidence of damages before evidence of liability. Further, the court excluded various of plaintiffs' proposed evidence, including the testimony of a proposed expert witness. Most importantly, when plaintiffs rested their case, the court granted defendants' motion for a directed verdict. Thereafter, the court imposed sanctions totaling $250,-000.00 against Yagman and his professional corporation, based on the authority of Fed.R.Civ.P. 11; 28 U.S.C. § 1927, and Central District Local Rule 27.1.

Plaintiffs appeal the directed verdict against them on all grounds specified by the court, as well as various subsidiary rulings made by the court throughout the trial. In addition, plaintiffs levy charges of bias against Judge Real and allege that they were denied a fair trial. In a consolidated appeal, Yagman is represented by separate counsel in challenging the court's imposition of sanctions.

## DISCUSSION

### A. CHOICE OF LAW

The choice of law issue was vigorously contested before trial. In a twist of arguments, the California resident plaintiffs asked that New York law be used, while the New York resident defendants contended that California law should be applied. The district court, after briefing and a hearing, agreed with defendants and chose California law. We review this question of law de novo. *Jenkins v. Whittaker Corp.*, 785 F.2d 720, 724 (9th Cir.1986) (citing *In re McLinn*, 739 F.2d 1395, 1398 (9th Cir. 1984) (en banc)).

In order to make the correct choice of law in a diversity case such as this, the federal court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477, 1480 (1941); *Fleury v. Harper & Row, Publishers, Inc.*, 698 F.2d 1022, 1025 (9th Cir.), *cert. denied*, 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983). California uses a "governmental interest" approach to the choice of laws. *Nelson v. International Paint Co.*, 716 F.2d 640, 644 (9th Cir. 1983); *Fleury*, 698 F.2d at 1025; *Hurtado v. Superior Court of Sacramento County*, 11 Cal.3d 574, 579, 114 Cal.Rptr. 106, 109, 522 P.2d 666, 669 (1974). Under this approach, it is obvious that both California and New York are "interested" states. Each has an interest in having its laws applied, due primarily to the fact that residents of each are parties to this action, and despite the fact that the residents urge against application of their own state's laws.

What is not so obvious, however, is whether there is any material difference between the substantive laws of New York and California, as they apply to this case. It is axiomatic that, unless there is a difference between the laws of the states, a choice need not be made. *Nelson*, 716 F.2d at 644; *Fleury*, 698 F.2d at 1025. Plaintiffs have not demonstrated any differences,[1] and defendants accurately point out that in many instances the laws of the two states will be identical since they address federal constitutional issues that are controlled by United States Supreme Court authority. Nevertheless, plaintiffs have indicated in passing that they prefer New York law because it has no privileges and immunities which might bar their claims.

---

**1.** Plaintiffs' attempt to incorporate by reference, into their brief, memoranda submitted to the district court below is prohibited by Ninth Circuit Rule 13(i).

Because the district court's directed verdict rested in part upon privileges supplied by California law, we will assume for purposes of deciding this issue that differences do exist between the laws of New York and California.

■ Under the California governmental interest approach, where two interested states have conflicting laws, the court will apply "the law of the jurisdiction whose interest would be more impaired if its law were not applied." *Nelson*, 716 F.2d at 644 (citing *Liew v. Official Receiver and Liquidator*, 685 F.2d 1192, 1196 (9th Cir. 1982)). Without question, the district court was correct in concluding that in this case California's interest would be more impaired if its laws were not applied. New York is indeed the state in which the defendants both reside and in which the allegedly defamatory remarks were uttered. However, because California is the state in which both plaintiffs lived and worked throughout the transactions involved, it is the state where the damage to plaintiffs' reputations, if any, would have occurred. As the district court noted, New York has "absolutely no interest in the reputation of a California citizen." (Reporter's Transcript, March 22, 1984, p. 40). The fact that California is the forum state further strengthens our conclusion, for we have said that in cases of this nature application of the laws of the forum state is preferred. *Fleury*, 698 F.2d at 1025. For these reasons, we agree with the district court's choice of laws.[2]

## B. OPENING STATEMENTS

■ The district court ordered the parties to make their opening statements to the entire prospective jury panel before voir dire.[3] Plaintiffs argue, without supporting authority, that it is a violation of due process for counsel "to communicate with a jury in any fashion before the members of the jury are sworn...." (Plaintiffs' brief at 48). We disagree with this broad proposition. Certainly there may be situations in which communication to the jury would give rise to due process concerns, but this could not be true in the situation at bar. The district judge, in ordering the special procedure for opening statements, was obviously concerned about the substantial publicity that had surrounded the events leading up to the trial. By making opening statements to the prospective jurors, the court hoped to acquaint all panel members with the case so that they could better determine if they could fairly sit on the jury. The opening statements were made in open court and voir dire followed immediately. There were no improper communications with the jury. It must be remembered that the conduct and order of the trial are matters vested in the discretion of the district judge. *Chicago, Milwaukee, St. Paul & Pacific R. Co. v. Poarch*, 292 F.2d 449, 452 (9th Cir.1961). The district court did not abuse its discretion in this instance.

## C. DIRECTED VERDICT

The district court granted defendants' motion for directed verdict on nine grounds. We review the directed verdict *de novo*, using the same standard applied by the district court. *Jenkins*, 785 F.2d at 729. Under that standard, a directed verdict is proper if the evidence permits only one reasonable conclusion as to the verdict. *Othman v. Globe Indemnity Co.*, 759 F.2d 1458, 1463 (9th Cir.1985). Therefore, we must examine all the evidence in the light most favorable to the plaintiffs to decide whether there is substantial evidence that could support a finding in favor of plaintiffs. *Id.*

---

**2.** Plaintiffs' argument that questions of fact needed to be decided by the jury before the choice of laws issue could be resolved is not well taken. Not only have plaintiffs been unable to identify the disputed factual issues that they claim were in need of resolution, but as the discussion above illustrates, a choice of law under the governmental interest approach is a legal determination to be made by the court.

**3.** Plaintiffs' counsel twice waived the opportunity to make an opening statement, once before the district court announced the procedure for opening statements and once after.

■ One of the grounds for the directed verdict was the court's finding that "all statements made by the defendants which are the subject of this action constituted expressions of opinion, and not statements of fact." As previously mentioned, defendants' statements which kindled this action were uttered at both the private meeting in Dr. Weinberg's office and the subsequent press conference. Plaintiffs argue that the district court erred because the statements were clearly statements of untrue fact, or, at a minimum, capable of being interpreted as such by a jury. Specifically, plaintiffs allege that the defendants "touted themselves as ones in positions to know the facts," and stated as a matter of fact that the plaintiff police officers had murdered Settles. (Plaintiff's brief at 30). The determination of whether a challenged statement is one of fact or of opinion is a question of law, appropriate for *de novo* review on appeal. *Lewis v. Time Inc.*, 710 F.2d 549, 553 (9th Cir.1983); *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 783 (9th Cir.1980); *Gregory v. McDonnell Douglas Corp.*, 17 Cal.3d 596, 601, 131 Cal.Rptr. 641, 644, 552 P.2d 425, 428 (1976); *see also Ollman v. Evans*, 750 F.2d 970, 978 (D.C.Cir.1984) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); *Rinsley v. Brandt*, 700 F.2d 1304, 1309 (10th Cir. 1983); *Orr v. Argus-Press Co.*, 586 F.2d 1108, 1114 (6th Cir.), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979).[4]

■ It is by now well settled that there exists a constitutional privilege for expressions of opinion. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court identified this privilege, based on the principle that "[u]nder the First Amendment there is no such thing as a false idea." *Id.* at 339–40, 94 S.Ct. at 3007, 41 L.Ed.2d at 805. *See also, Lewis*, 710 F.2d at 552–53. It follows from this principle that since an opinion is protected because it cannot be

false and a statement is not actionable defamation unless it is false, "an opinion is simply not actionable defamation." *Lewis*, 710 F.2d at 553 (citing *Restatement (Second) of Torts* § 558(a) (1977)). "It makes no difference whether the plaintiff alleging the defamation is a private or a public person." *Lewis*, 710 F.2d at 553.

■ The difficulty that often arises, however, is in attempting to determine whether a publication constitutes a statement of fact or a statement of opinion. Not only is "accommodating the First Amendment's protection of free expression of ideas with the common law's protection of an individual's interest in reputation" an inherently delicate and sensitive task, *Ollman*, 750 F.2d at 974, it is made yet more difficult by "the richness and diversity of language, as evidenced by the capacity of the same words to convey different meanings in different contexts...." *Id.* at 978. This determination cannot be accomplished through application of a mechanical test, for the question presented does not lend itself to bright-line mechanics. Rather, in determining whether an allegedly defamatory statement is actionable fact or protected opinion, the court must

> examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.

*Information Control*, 611 F.2d at 784.

■ In making this determination at bar, we are aided by the fact that the press conference was recorded on video tape. Rather than relying on the recollections and approximations of witnesses, we are able to review the exact statements made

---

4. Although plaintiffs do note in passing our *de novo* standard of review over this issue, as cited in *Lewis*, we reject plaintiffs' apparent simulta-neous contention that the issue must be re-manded for a jury determination.

by the defendants at the conference and the precise context and language in which they were uttered. Our first observation is that nowhere at the press conference did either defendant expressly allege that one or both of the plaintiffs murdered Reginald Settles. In fact, neither of the plaintiffs were named at the press conference. Without question, however, some amount of implicit reference to plaintiffs was made at the conference.[5] Moreover, under the circumstances present at the time of the press conference, there is no question that all suspicion was directed squarely at plaintiffs. It is undisputed that plaintiffs were the only police officers who had access to Settles during the time period in which he died. Consequently, plaintiffs were the targets of a grand jury investigation and a civil suit launched by the Settles family. At the same time, the media had focused public scrutiny on plaintiffs from the start, by virtue of the close coverage given to the case. Therefore, any inferences made at the press conference, whether fact or opinion, were clearly understood to involve plaintiffs. *See Church of Scientology of California v. Flynn,* 744 F.2d 694, 697 (9th Cir.1984).

We are convinced, however, after analyzing the challenged statements in their total context, that the district court was correct in holding that they were constitutionally protected opinion. The circumstances surrounding the statements, the context in which they were uttered, and the language employed all lend support to this conclusion.

We have recognized that in a situation such as this, the words used are not by themselves determinative. *Information Control,* 611 F.2d at 783–84. It is important that the facts surrounding the publica-tion be duly considered because words are not defamatory unless they are understood in a defamatory sense. *Id.* In the factual surroundings at bar, it is important to note that the statements complained of concerned a hotly disputed issue: the unresolved cause of Settles' death. Although the official cause of death was listed by the Los Angeles County Coroner as suicidal hanging, it was by no means the consensus. The coroner's advisory jury voted five to four that the death was caused by another person or persons. The Settles family believed the same when they instigated their civil suit. The Los Angeles District Attorney appeared dissatisfied with the suicide finding. Public and media attitudes were, at best, skeptical. Against this backdrop, defendants were brought in as expert forensic pathologists to conduct the second autopsy in an effort to resolve the cause of death issue. Defendants were not paid for this service, although it can be assumed that defendants would have been retained as expert witnesses for the Settles family in the civil action.[6] Also invited to participate in the re-autopsy were Dr. Noguchi, whose office had performed the first autopsy, and Dr. Werner Spitz, a pathologist retained by the civil suit defendants.

It can be clearly deduced from this background that the overriding purpose of each of the four doctors, including defendants, in conducting the re-autopsy was to analyze the facts and render an opinion regarding the cause of death. With this purpose in mind, it is entirely logical that once the re-autopsy was completed, and the facts compiled and analyzed, the doctors would meet with the interested parties to render their opinions. Such was the apparent purpose of the initial meeting that took place in defendant Weinberg's office. Further,

---

5. For example, defendant Baden made a clear reference to plaintiffs when, in discussing the general concern about inaccuracies common to information gathering after an in-custody death, he said "[t]his becomes even more of a problem when the people involved do not testify in a grand jury process, as, for example, happened here." (Transcript of Exhibit No. 214 at 17).

6. The civil action was settled out of court. Although defendants were apparently never formally retained as experts for the Settles family, the opinions they formed about the cause of death make it safe to assume that they would have been so retained for trial. This assumption is also proper since we must view the facts and inferences in the light most favorable to plaintiffs.

due to the close media coverage afforded developments in the case, it is logically consistent that the four doctors would volunteer to share their long-awaited opinions with the eager media.[7] Viewed in the context of the background and circumstances in which the statements were made, therefore, the strongest conclusion to draw is that the statements were the individual opinions of the doctors.

The context of the statements as made at the press conference and the language used by the doctors strengthen our conclusion to the point of certainty. First of all, the press conference was structured so that each doctor in turn stated his opinion as to the cause of death, the basis for drawing that opinion, and then answered questions from the gathered media. It was strikingly clear from the start of the conference that the doctors were interpreting findings and presenting their individual opinions. In prefacing the conference, defendant Weinberg stated:

> After an exhaustive study of the Ron Settles death, [the four doctors] met today to discuss our findings. We are agreed on certain findings, and we do have certain differences on other aspects and other findings in the case. And each of the doctors here will be glad to answer questions or present his point of view.

(Transcript of Exhibit No. 214 at 6). Further, in answering an early question, Dr. Spitz stated:

> I think the other gentlemen should speak for themselves. Partly there is agreement; partly there is not agreement with regards to interpretation, not with regards to the findings.
>
> There can be no misinterpretation with regard to the findings, because they are there.

(Transcript of Exhibit No. 214 at 11). Plainly, the statements were made at the conference in the context of an airing of opposing opinions by four doctors who had compiled, analyzed and discussed the same objective data.

Second, we have recognized the importance of looking at the language of an allegedly defamatory statement, particularly where it is " 'cautiously phrased in terms of apparency' or is of a kind typically generated in a spirited legal dispute...." *Information Control*, 611 F.2d at 784 (quoting *Gregory*, 17 Cal.3d at 603, 131 Cal. Rptr. at 645, 552 P.2d at 429). Cautionary language may put the listener on notice that what is being heard is opinion, "and thus weaken any inference that the [speaker] possesses knowledge of damaging, undisclosed facts." *Ollman*, 750 F.2d at 983.

The language used by each of the four doctors was heavily punctuated with cautionary terms such as "in my opinion" and "my view." Plaintiffs aptly argue that otherwise defamatory statements cannot be immunized by the mere insertion of cautionary language. It is because we agree with this proposition that we have emphasized that the language of the statement involved is only one of several factors to be considered in this assessment. *See Information Control*, 611 F.2d at 783–84; *Lewis*, 710 F.2d at 553. The content of the statements at bar, however, clearly belies any notion that the cautionary language employed by the doctors was inserted to disguise factual assertions and escape liability. The content of the statements reveals only true expressions of opinion. Each doctor carefully emphasized that he was expressing only his opinion, and each detailed the basis for that opinion. The opinions were naturally based upon each doctor's interpretation of the objective facts in light of his own experience. In addition, due to the inconclusiveness of the objective facts, each doctor left ample room

---

**7.** A true opinion is no less an opinion, nor does it lose its protected status, merely because it is offered in a public rather than private forum. "[W]e cannot forget that the public has an interest in receiving information on issues of public importance even if the trustworthiness of the information is not absolutely certain. The First Amendment is served not only by [statements] that purport to be definitive but by those [statements] that ... raise questions and prompt investigation or debate." *Ollman*, 750 F.2d at 983.

for the consideration of opposing interpretations of the facts. For example, defendant Baden stated:

> it is my opinion that although suicidal hanging can't be excluded ... the findings are atypical for the kind of hangings that we investigate that occur in custody and is more likely to be due to bilateral compression of the neck ... my view would be different than Dr. Spitz' ... the pattern, to me, from my experience of lack of injury to the skin, lack of marks on the skin, minimal injuries in the underlying tissues of the neck and the peculiar hemorrhage in the esophagus that Dr. Weinberg has studied very closely, to my interpetation, is more common for neck compression .... And this, to my mind, does not conform to the pattern of suicidal jail hangings, either by the anatomical findings at autopsy, by the chemical findings or absence thereof, and by the circumstances .... I do not think there is sufficient evidence to say beyond a reasonable—to a reasonable medical certainty death is by chokehold. But I think it is more likely—51 percent versus 49 percent.

(Transcript of Exhibit No. 214 at 13–19).[8] Consequently, we are convinced that the statements of the defendants were constitutionally protected opinion. Taken together, the language used, the context of the statements and the surrounding circumstances clearly demonstrate that the allegedly slanderous remarks could only be understood as the individual opinions of the defendants.

We reject plaintiffs' contention that the statements are not constitutionally protected, even if they are opinion, because they involve accusations of criminal conduct. Although courts have held that "opinions" which accuse dishonesty or criminal conduct are not constitutionally protected because they are too laden with factual content to be protected as belief, *e.g., Cianci v. New Times Publishing Co.,* 639 F.2d 54, 62–65 (2d Cir.1980); *Gregory,* 17 Cal.3d at 604, 131 Cal.Rptr. at 646, 552 P.2d at 430, we do not believe the instant action falls within the confines of that authority. First, the action at bar is factually distinguishable from *Cianci,* the case principally relied on by plaintiffs. In *Cianci,* the plaintiff was explicitly named and accused of raping a woman and subsequently paying her off to escape prosecution. Conversely, in the statements at hand, the plaintiffs were never explicitly named, nor were they specifically charged with wrongdoing. We have recognized that various inferences can be drawn which link plaintiffs to the death, but those inferences are based upon speculation and divided expert opinion, as discussed above. Certainly, those inferences are not "laden with factual content" as contemplated by *Cianci.* Second, the only "facts" set out at the conference were those undisputed medical findings upon which the varying interpretations and opinions were based.[9] We have held that when the underlying facts are

---

**8.** Defendant Weinberg prefaced his interpretation of the medical evidence and circumstances attending the death by stating "[a]s you can see, there is a diversity of opinions among the four so-called experts. I would like to briefly state my opinion and my feeling." (Transcript at 29). Similarly, Doctors Spitz and Noguchi carefully explained their interpretations and emphasized that each was presenting his own personal opinion. (Transcript at 7–13, 25–29).

**9.** Plaintiffs allege that "since appellees set forth the 'facts' on which their alleged 'opinions' were based, and since the 'facts' were false, the 'facts' constitute actionable defamation." (Plaintiffs' brief at 31). Plaintiffs do not specify, however, any "facts" that were false. Presumably, plaintiffs refer to the only "facts" to be set out at the conference, the undisputed medical findings. These included damage to the esophagus, markings on the neck, other injuries and markings on the body, chemicals in the blood, and condition of the body when found. Assuming that these are the facts referred to by plaintiffs as false, their argument is not well taken because these objective facts were recognized by the four doctors who took part in the re-autopsy. Nothing in the proffered testimony of plaintiffs themselves or the proposed opinion of plaintiffs' expert, which was excluded, can contradict the factual medical data. In fact, plaintiffs' witness Inlow Campbell admitted that the four doctors agreed upon these physical facts. (Reporter's Transcript, April 4, 1984, Vol. 2, pp. 88–93).

true, as here, the Constitution protects the opinion from liability. *Lewis,* 710 F.2d at 556.

■ We recognize further that, unlike the statements made at the press conference, the statements made at the private meeting were not recorded. Consequently, we cannot as readily examine the specific statements made at the private meeting. Nevertheless, we are convinced that they too were protected statements of opinion. As noted previously, the context of the private meeting was a gathering by interested parties in the civil suit in order to learn the findings and opinions of the four pathologists. Further, plaintiffs' witness admitted that, except for greater detail concerning the medical findings, the statements made at the private meeting were essentially the same as those made at the press conference.[10] Consequently, we draw identical conclusions with respect to the private meeting statements. If anything, our conclusion that these statements are opinion is made stronger by the more limited and more peculiarly interested audience. We have previously pointed out that the audience and the audience's anticipations should be considered in determining whether a statement is fact or opinion. *Lewis,* 710 F.2d at 553–54; *Information Control,* 611 F.2d at 784. Inasmuch as the audience at the private meeting was made up of those persons most intimately involved in the underlying civil litigation, most, if not all, of whom had attended the re-autopsy and anticipated this conclusory meeting, it is entirely unlikely that the challenged statements were understood as anything other than nonactionable opinion.

Our holding, therefore, is that the allegedly slanderous statements were, as a matter of law, constitutionally protected opinion. As a result, the district court was correct in directing the verdict in favor of the defendants. We need not address the remaining grounds for the directed verdict.

## D. EXCLUSION OF EVIDENCE

■ Plaintiffs object to the district court's exclusion of parts of their own testimony and all of the testimony of their proposed expert witness.[11] We need not decide if it was an abuse of discretion to exclude that evidence, however, because assuming *arguendo* that exclusion was error, it was most certainly harmless. "A trial court's error in excluding evidence in civil actions is harmless if its decision is 'more probably than not untainted by the error.'" *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1516 (9th Cir.1985) (quoting *Haddad v. Lockheed California Corp.,* 720 F.2d 1454, 1459 (9th Cir.1983)). The excluded evidence was proffered on the issue of actual malice. Since we have concluded that the directed verdict was proper on the ground that the statements were protected opinion, any error in excluding evidence as to the actual malice issue was harmless.

## E. ALLEGATIONS OF UNFAIRNESS

Plaintiffs levy very serious charges of misconduct against Judge Real. In short,

---

10. On cross-examination at trial, Mr. Inlow Campbell testified as follows:

 Counsel: Isn't it a fact, Mr. Campbell, that except for going into more detail concerning the medical findings at the private meeting, what Dr. Weinberg and Dr. Baden said at the press conference which is on the video tape is essentially the same as they said at the private meeting?

 Witness: Just about, yeah. The medical detail was gone into I think in greater depth in the private meeting.

 I don't recall the discussion and demonstration of the choke hold at the press conference that occurred at the private meeting, and there were some other things that were more the background of the case than the medical parts that were discussed in the private meeting.

 Counsel: With respect to the question of the manner in which Reginald Settles died, can you presently think of any statement that was said by Dr. Baden or Dr. Weinberg at the private meeting that is not contained on the video tape?

 Witness: In substance, no.

 (Reporter's Transcript, April 4, 1984, Vol. 2 at 86–87).

11. Plaintiffs' failure to provide the relevant pages of the reporter's transcript in the excerpt of record on appeal is a violation of Ninth Circuit Rule 13(a)(1)(B).

they allege: (1) that Judge Real "reached out and took this case" in violation of the local rules, and (2) that Judge Real erred by not recusing himself *sua sponte* on the grounds of personal prejudice.

### 1. *Random Transfer*

██ Shortly before the scheduled trial date, Judge Lydick became ill and this action was transferred to the calendar of Judge Real. The transfer was accomplished by an order which was signed by both judges. Plaintiffs allege that this transfer violated the local rules of the Central District of California concerning random assignment of cases and ask that we reverse all of Judge Real's rulings and remand for random reassignment and retrial.

General Order No. 224, promulgated pursuant to the local rules, governs the assignment of cases within the Central District. Rule 4.1 flatly provides for the voluntary transfer of an action from one judge to another. All that is required to effectuate

such a transfer is an order executed by the two judges.[12] It is clear that the transfer at bar was made pursuant to this rule. Plaintiffs argue, however, that the transfer violated rule 4.4, which provides that in the event of the "prolonged illness, disability, or other unavoidable absence" of a presiding judge, the court may randomly reassign cases from that judge's calendar.[13] Contrary to plaintiffs' argument, Rule 4.4 is not mandatory in every instance of illness. Rather, it merely supplies a means for the court to take a case from an unavailable judge in the interest of justice. There is nothing in these rules to prohibit an ill judge from transferring a case pursuant to Rule 4.1, as was done here.

██ We further decline plaintiffs' urging that we invoke the general supervisory power of this court to reverse the district court on the basis that the transfer to Judge Real is "suspicious."[14] As discussed below, the motive attributed to Judge Real by the plaintiffs is speculative and entirely unsupported by the record.

**12.** The text of Rule 4.1 provides as follows:
**4.1 VOLUNTARY TRANSFERS**
The judge to whom any particular action or proceeding is assigned will have full charge of such case until terminated except that (1) the matter may be transferred by order of the transferor and tranferee judge, or (2) by order of the Chief Judge, with the consent of the transferor and transferee judge. If such a transfer is made it shall be respectively debited and credited against the transferor and transferee judges' general obligation to receive civil cases.

**13.** The text of Rule 4.4 provides as follows:
**4.4 PROLONGED ILLNESS OR UNAVOIDABLE ABSENCE**
In the event of prolonged illness, disability, or other unavoidable absence of the judge to whom a civil case has been assigned, the Court may transfer from the calendar of such absent judge any case or cases deemed necessary to expedite the business of the Court and obtain justice for the litigants. Such case or cases shall be returned to the Clerk for assignment in the same manner as an original case assignment as provided in this General Order.
Original case assignment is provided for in Rules 1.2, 1.3 and 1.4 as follows:
**1.2 ASSIGNMENT CARDS**
Assignment cards shall be prepared and sealed in plain envelopes under the supervi-

sion of the Chief Judge in such a manner that each judge of the Court over a period of time shall be assigned substantially an equal amount of work. The envelopes containing the assignment cards shall be shuffled to provide a completely random assignment of cases to the judges of the Court.
Neither the Clerk or any Deputy Clerk shall have discretion in determining the judge to whom any civil case shall be assigned. The action of the Clerk in the assignment of cases is ministerial only.
**1.3 RANDOM SELECTION**
The method for assignment of cases chosen by the judges shall be such that the judge to whom any particular matter is to be assigned, shall not be known by or disclosed to the Clerk, any member of his staff or any other person until after such case has been filed and numbered.
**1.4 ASSIGNMENT TO A PARTICULAR JUDGE**
The Clerk shall, after filing and numbering the case, withdraw a sealed envelope containing the initials of the judge to whom the case is to be assigned.

**14.** This should not be read as an acknowledgment that our supervisory power would necessarily reach to this situation. Because we need not answer that question, we leave it for another day.

We will not invade the province of the district court on such a feeble basis. We nevertheless take this opportunity to underscore the concerns for avoiding the appearance of arbitrariness and unfairness that we expressed in *United States v. Flynt*, 756 F.2d 1352, 1355 n. 2 (9th Cir. 1985). In providing for the random assignment of cases, the "General Order evinces a policy of objectivity and fairness in the distribution of all matters ... that ... is important to the fair administration of justice...." *Id.* Courts must be meticulously careful, when invoking direct transfer provisions such as the instant Rule 4.1, to avoid any improper appearance. In order "to perform its high function in the best way, 'justice must satisfy the appearance of justice.'" *Aetna Life Insurance Co. v. Lavoie*, —— U.S. ——, ——, 106 S.Ct. 1580, 1587, 89 L.Ed.2d 823, 835 (1986) (citations omitted).

### 2. *District Court Bias*

Plaintiffs allege that they were denied their day in court from the time Judge Real took over the case, due to his "patent hostility" and his "one-sided and arbitrary" conduct of the trial. Terming it a "judicial mugging" and "tyranny in its worst form," plaintiffs charge that Judge Real "exhibited a strong personal bias and prejudice against Stephen Yagman of unmistakable

longstanding [sic], and a partiality for the defendants" that was manifested in rulings and actions throughout the trial. Having reviewed the entire trial transcript, we find no grounds for reversal.

We recognize that we cannot really resurrect the atmosphere at trial, the tone of voice, or the facial and other body language. We are nonetheless convinced by the cold record on this appeal that plaintiffs' misconduct allegations must fail. Although, from a broad viewpoint, there was obviously a certain amount of tension at trial, such is not uncommon in emotional and hard-fought cases. Because the nature of our system is adversarial, parties will occasionally be uncooperative, both with each other and with the court, and courts will sometimes be exacting. These elements foster tension. The single most important concern in these situations, as in every case, is ensuring that all parties are afforded a fair and complete opportunity to present their evidence and arguments. We have no doubt that the plaintiffs in this case fairly received their day in court.

■ One of plaintiffs' specific complaints is that Judge Real required them to put on evidence of damages before liability. That ruling was brought about by a verbal exchange between Judge Real and Yagman that displays frustration on the part of both men.[15] To be sure, the ruling incon-

---

15. The exchange, which took place before the jury was seated on the first morning of trial, went as follows:

THE COURT: Are you asking for only nominal damages? Is that it?
MR. YAGMAN: No, we're not, your Honor.
THE COURT: Then if you're going to put on a question of damages, what kind of evidence are you going to put on on damages?
MR. YAGMAN: We haven't yet determined that, your Honor.
THE COURT: Well, this is the day of trial, Mr. Yagman.
MR. YAGMAN: YES, I—
THE COURT: I would guess that you would have that ready. What evidence are you going to put on?
MR. YAGMAN: It's ready in alternative forms, your Honor.
THE COURT: Beg your pardon?
MR. YAGMAN: A decision has not yet been made. We are not prepared.

THE COURT: What do you mean? This is the day of trial, Mr. Yagman. Now, what evidence are you going to put on on the question of damages?
MR. YAGMAN: I'm not prepared to answer that question, your Honor.
THE COURT: If you're not prepared to answer that question, than I am prepared to rule on the question of damages and what evidence would be admissible on that question.
MR. YAGMAN: Your Honor, it's our plan—
THE COURT: You're going to tell me that or I'm going to rule and you're not going to put on any evidence of damages. You're going to go on the so-called per se rule that you're talking about.
MR. YAGMAN: We are, your Honor.
THE COURT: That's it? You're not going to put on any evidence of damages?
MR. YAGMAN: That's correct.
THE COURT: So you are asking for only nominal damages?

venienced plaintiffs in that they had to alter their order of proof, but even if we assume *arguendo* that the ruling was erroneous, we cannot agree that plaintiffs were harmed. Plaintiffs did in fact present evidence of damages and were then given a complete opportunity to present evidence of liability. We are satisfied that plaintiffs received a fair trial in this respect.

▮▮▮ Plaintiffs also charge that Judge Real's questioning of witnesses was hostile and designed to elicit responses favorable to the defendants. We disagree. The district court has a right and a duty "to facilitate, by direct participation, the orderly progress of a trial." *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1383 (9th Cir.1984) (citations omitted). Judge Real's queries were obvious efforts to clarify relevant testimony. Such questions "are eminently proper so long as the authority is exercised in a non-prejudicial manner." *Id.* We find the questions asked were well within the court's authority and discretion.

▮▮▮ We have also considered plaintiffs' more general complaint that Judge Real was one-sided in his rulings as a whole, tending to rule in favor of defendants by rote. We disagree with plaintiffs' characterization of the rulings as arbitrary. For example, plaintiffs state that when "Judge Real brushed aside Judge Lydick's careful" choice of law ruling, it was "the first of a virtually unbroken chain of rulings ... fa-

voring the defendants ...." (Yagman's brief at 29). Judge Real's choice of law ruling, however, which we have held to be correct as a matter of law, was made after two days of pre-trial hearings at which both parties presented evidence, questioned witnesses and argued their positions. Further, it must be recognized that during the course of a trial, the court may be required to make hundreds of individual rulings. An even distribution of these rulings in favor of each party is obviously not a prerequisite for, nor synonymous with, a fair trial. We are satisfied, after reviewing the entire transcript, that the district court was not arbitrary in this case.[16]

▮▮▮ Finally, because the essence of plaintiffs' claim is that they were denied a fair trial due to the district judge's bias, we have analyzed this situation under the standards of 28 U.S.C. § 455. Section 455 provides for the disqualification of a federal judge "if a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *In re Manoa Finance Co.*, 781 F.2d 1370, 1372–73 (9th Cir.1986) (quoting *Sakellar v. Lockheed Missiles and Space Co.*, 765 F.2d 1453, 1457 (9th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 856, 88 L.Ed.2d 896 (1986)). Plaintiffs speculate that the motive for Judge Real's alleged bias may have been due to

---

MR. YAGMAN: No, we're not, your Honor.
THE COURT: Well, then, what are you going to put on for nominal damages?
MR. YAGMAN: We're going to put on the testimony of what was said, which was defamatory, so that the jury can evaluate what harm it believes the publication of those statements caused to the plaintiffs.
THE COURT: Well, that isn't evidence, and if you're going to rest on that, let me tell you now, now, you won't get beyond your case if you're going to rest on that. Let me tell you that now, because that's what you're telling me, that this jury is going to have to make some determination of damages other than nominal damages on no evidence of damages. That's what you are telling me.
MR. YAGMAN: I've tried to explain to the Court, we have not yet made a decision.
THE COURT: I'm asking you to make that decision because this is the day of trial. You are now ready for trial. And if I want

to, I will ask you to put the damage evidence on first, which I can do in my discretion.
Now, we'll do that, Mr. Yagman. You will put on the evidence of damage first. Then we will go to the question of liability. (Reporter's Transcript, Apr. 3, 1984, pp. 25–27).

16. A few evidentiary objections may have been sustained in error, although plaintiffs have not challenged them specifically. We are convinced that they did not work to harm plaintiffs. Thus, we refuse to upset the remainder of the district court's many, many correct and reasoned rulings. It also appears that on occasion Judge Real lost his patience when Yagman declined to answer a direct question or admitted a lack of preparation. We find nothing extraordinary in this, however, that would justify a finding that Judge Real was improperly biased.

the fact that Yagman was scheduled to testify against the judicial nomination of a colleague of Judge Real. Plaintiffs posit that Judge Real may have found out about the scheduled testimony, snatched this action from Judge Lydick's calendar, and re-set the trial so as to conflict with Yagman's scheduled testimony. There is no evidence in the record whatsoever to support this theory, however. On the contrary, when the beginning trial date of April 3 was first suggested, Yagman noted that he had another trial starting on April 10, but made no mention of his April 6 scheduled testimony. (Reporter's Transcript, Mar. 20, 1984, pp. 12–13). The first mention of the scheduled testimony came on the second morning of trial when Yagman suddenly asked to be excused from trial for that reason. The court refused to rule on the request at that time,[17] and the point became moot when the trial ended prior to the time Yagman was scheduled to testify. We conclude, therefore, that plaintiffs were not denied a fair trial and an impartial judge.[18]

## F. SANCTIONS

Immediately after directing the verdict and dismissing the jury, the district court suggested "to the defendants that they may have a Rule 11 sanctions motion since there may be a very, very serious problem of good faith." (Reporter's Transcript, April 5, 1984, p. 21). The defendants responded with a motion for sanctions in the amount of $250,000.00. Following a hearing at which Yagman was represented by counsel, the court imposed sanctions against Yagman and his professional corporation, Yagman & Yagman, P.C., in the requested amount, based on the authority of Rule 11, section 1927, and Local Rule 27.1. Yagman vigorously contests the validity of these sanctions in all respects.

### 1. *Procedure*

Initially, Yagman compares the instant sanction proceedings to criminal contempt and argues that "it was a denial of due process as well as a violation of [section] 455 for Judge Real to fail to disqualify himself" from the sanction proceedings. (Yagman's brief at 32). We have recognized that, generally, monetary sanctions, which derive from a failure to carry out the special responsibility an attorney has in the judicial process, differ

> from the more severe infractions of criminal contempt for which attorneys and members of the general public can become liable. The former is an unjustified failure to carry out an administrative responsibility as an officer of the court; the latter is an affront to the authority of the judge.

*Miranda v. Southern Pacific Transportation Co.,* 710 F.2d 516, 521 (9th Cir.1983); *see also Eash v. Riggins Trucking Inc.,* 757 F.2d 557, 566 (3d Cir.1985). It is nevertheless possible for a monetary sanction to assume the criminal character of a fine. For example, if the amount of the sanction imposed is grossly disproportionate to the attorney's misconduct or otherwise falls

---

17. The following exchange occurred:

MR. YAGMAN: I would like the Court's permission to be excused on Friday afternoon so that I can testify against Judge Lucas at the hearing of the Commission on Judicial Appointments between 1:30 and 3:00 o'clock on Friday afternoon.

THE COURT: Well, I don't know that that's a reason to be excused from this case. I guess you have a First Amendment right to do that, Mr. Yagman, but I don't know that we have to accommodate that necessarily. You put this Court in a position, which you like to do, Mr. Yagman, and that is, if I should deny you that privilege, what you are telling me is, I am doing it because he happens to be a judge of this court. I know

how you operate, Mr. Yagman. So please don't do that to me.

MR. YAGMAN: May I have permission to—

THE COURT: I am not ruling on anything. Bring in the jury.

(Reporter's Transcript, Apr. 4, 1984, pp. 4–5).

18. To the extent, if any, that plaintiffs lacked a "day in court," it was most likely due to an abandonment of that day by plaintiffs' counsel. Yagman did not, for example, present an opening statement, nor did he argue against the motion for directed verdict. In addition, Yagman, on occasion, admitted being unprepared and refused to answer direct questions from the court.

outside the bounds of the authority for the sanction, then the court should be cognizant of the possibility of a latent fine. If, in addition, the record reflects that the judge imposing the sanction has been the target of the sanctioned attorney's vilification or was otherwise personally embroiled with the attorney during the trial, the suspicion is intensified and the court must carefully assess the circumstances to determine if additional due process safeguards are called into play.

■ In the case at bar, we are convinced, after a thorough review, that due process concerns have been fully satisfied. Admittedly, $250,000.00 is a remarkably large monetary sanction—large enough to raise immediate suspicion. That amount, however, is purported to be less than the total attorney's fees expended in defense of this action. The three rules cited by the district court as authority for the sanctions all provide for the award of attorney's fees.[19] Ostensibly, therefore, if we assume for the moment that the district court is correct in its findings about the applicability of these rules to this case and about the reasonableness of the amount itself, the mere size of the sanction does not transform it into a criminal fine because attorney's fees are specifically authorized as a measuring rod. Further, we do not find in the record the type of personal embroilment or derogatory attacks leveled at Judge Real that would ordinarily carry such potential for bias as to require disqualification as a matter of due process. *See Mayberry v. Pennsylvania*, 400 U.S. 455, 465–66, 91 S.Ct. 499, 504–05, 27 L.Ed.2d 532, 540 (1971); *Flynt*, 756 F.2d at 1366 n. 13, *as modified*, 764 F.2d 675 (9th Cir.1985). We conclude, therefore, that due process concerns did not mandate that a different judge preside over the sanctions proceedings.

■ We also reject the contention that Judge Real erred by not *sua sponte* disqualifying himself for bias under section 455. As we have discussed, there is no support in the record for the claim that Judge Real was personally biased or prejudiced against Yagman. The invidious motive articulated by Yagman is entirely speculative. Further, although it is obvious that Yagman and Judge Real clashed several times during the trial over various objections, evidentiary matters, and rule violations, we find none of it remarkable enough to indicate a need for Judge Real to disqualify himself from deciding the issue of sanctions. A judge may impose sanctions such as those at bar on his or her own initiative. When this occurs, the judge will obviously be dissatisfied with some aspect of the offending attorney's conduct. Often the judge may be angry with the attorney for violating one or more rules. Without more, this natural responsive attitude does

---

19. **As amended in 1983, Rule 11 provides:**

Every pleading, motion, or other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated ... The signature of an attorney ... constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the Court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

**28 U.S.C. § 1927 provides:**

Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

**Local Rule 27.1 provides:**

Penalty—Violation of Rule—Violation of or failure to conform to any of these Local Rules, the F.R.Civ.P., F.R.Crim.P., or F.R.App.P., shall subject the offending party or counsel to such penalties, including monetary sanctions and/or the imposition of costs and attorney's fees to opposing counsel, as the Court may deem appropriate under the circumstances.

not provide reasonable grounds to question the judge's impartiality, either because of the appearance or the fact of bias or prejudice, in presiding over the sanctions proceeding.

[T]he negative bias or prejudice of the kind alleged here will disqualify only if it is an attitude or state of mind that belies an aversion or hostility of a kind or degree that a fair-minded person could not entirely set aside when judging certain persons or causes. It is an animus more active and deep-rooted than an attitude of disapproval toward certain persons because of their known conduct[.]

*United States v. Conforte,* 624 F.2d 869, 881 (9th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980). We cannot find, on this record, reasonable grounds to question the impartiality of Judge Real in presiding over the issue of sanctions in this case. Consequently, we hold that Judge Real did not err in failing *sua sponte* to recognize obvious grounds for recusal and to grant recusal pursuant to section 455. *See United States v. Sibla,* 624 F.2d 864, 868 (9th Cir.1980).

### 2. *Merits*

We turn next to the substantive questions that surround the imposition of sanctions in this case. In its written opinion, the district court detailed numerous examples of Yagman's conduct and concluded that Yagman pursued this action vexatiously and in bad faith from beginning to end. In the court's concluding words:

Yagman's conduct from the outset was violative of the Rules and common sense. His filing of the lawsuit was violative of Rule 11, F.R.Civ.P. [sic] His unreasonable and vexatious conduct in the prosecution of the action from the onset multiplied the proceedings totally out of proportion, in violation of 28 U.S.C. § 1927. His total conduct calls for sanctions pursuant to Local Rule 27.1. It is difficult to conceive of a case more subject to sanctions upon an attorney than this one.

(C.R. 279 at 18). By reason of this bad faith conduct, the court further found, defendants were required to incur expenses in excess of $293,000.00. Because defendants only requested sanctions in the amount of $250,000.00, however, the district court imposed sanctions upon Yagman in that amount, noting that the lower sum "takes well into account any previous sanctions paid by Yagman." (C.R. 279 at 18).[20]

As judges, we are particularly sensitive to the problem of, and widespread concern over, frivolous litigation and the abusive practices of some attorneys. "These practices tend to impose unjustified burdens on other parties, frustrate those who seek to vindicate their rights in the courts, obstruct the judicial process, and bring the civil justice system into disrepute." Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 182 (1985). *See also Carlucci v. Piper Aircraft Corp., Inc.,* 775 F.2d 1440 (11th Cir. 1985). Fairness to litigants who suffer from such abuse, and others in the case load queue, depends in large part upon reducing the reluctance of lawyers to seek and judges to impose sanctions in proper circumstances. At the same time, we embrace the fact that zealous advocacy is the attorney's ideal. Hard-fought, energetic and honest representation is at the bedrock of our judicial process. None of the various rules and statutes that authorize sanctions are intended, nor should they be implemented, "to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." *See* Proposed Amendments to Fed.R.Civ.P. 11, Advisory Committee Notes, 97 F.R.D. 198, 199 (1983).

The line between these equally important concerns is necessarily vague. Each case must be taken individually and evaluated in light of its own peculiar circumstances. If sanctions are warranted by those circumstances, the court should not waiver in imposing them. In so doing,

---

**20.** Yagman was sanctioned on at least two previous occasions in connection with discovery abuses in this case.

however, the court must be meticulously aware that this precarious balance can only be maintained if the sanctions are justly imposed. This means foremost that the conduct in question must in fact be sanctionable under the authority relied upon. It also means that the amount of the sanctions and the manner in which they are imposed cannot be inconsistent with the purpose and directive of the authority on which the sanctions are based. We must reverse the instant sanctions award because it does not fall within these guidelines and, therefore, poses a direct threat to the balance between sanctioning improper behavior and chilling vigorous advocacy. We will discuss first the problems with this sanctions award in terms of the amount and the manner in which it was imposed. Second, we will analyze the suitability of these sanctions under each of the three sources of authority cited by the district court and in the context of the particular misconduct attributed to Yagman.

 As previously noted, Judge Real took over responsibility for this action only one week before trial. Many of Yagman's actions noted by Judge Real in imposing sanctions occurred when Judge Lydick was presiding. During that time, Yagman was in fact sanctioned for some discovery abuses, but only when requested by opposing counsel. In addition, the complaint withstood several motions for summary judgment in front of Judge Lydick. The procedure utilized by Judge Real in imposing sanctions, therefore, was essentially an accumulation of all perceived misconduct, from filing through trial, with a reevaluated determination that it was far more serious than appeared at the time. The result of this procedure is a single post-judgment retribution in the form of a massive sanctions award.

 The most obvious defect in this procedure is that it flies in the face of the primary purpose of sanctions, which is to deter subsequent abuses. This policy is not well served by tolerating abuses during the course of an action and then punishing the offender after the trial is at an end. A proper sanction assessed at the time of a transgression will ordinarily have some measure of deterrent effect on subsequent abuses and resultant sanctions. Such "prompt action helps enhance the credibility of the rule and, by deterring further abuse, achieve its therapeutic purpose." Schwarzer, *supra* at 198. Moreover, the accumulation procedure used at bar "tends to perpetuate the waste and delay which the rule[s are] intended to eliminate." *Id.* We are convinced that the magnitude of the sanctions in this case is directly related to the use of this procedure. Abuses were allowed to pass unchecked and, thus, undeterred, and attorney's fees were allowed to accumulate. As a consequence, we are left faced with an unusually large sanctions amount that will, contrary to the policy, impart absolutely no deterrent value to this case. It appears the efficiency achieved by levying two years' worth of sanctions in one post-trial lump has been paid for in wasted judicial resources and money.

 By this, we do not condemn as inappropriate in all cases the procedure of withholding the sanctions decision until the end of trial. In some situations, liability under proper sanctioning authority will not be immediately apparent or may not be precisely and accurately discernible until a later time. For example, findings under Rule 11 occasionally cannot be made until after the evidentiary portion of the trial. A claim may appear to raise legitimate and genuine issues before trial, even in the face of summary judgment challenges, but will be unmasked as not well-founded in fact after the claimant has presented his evidence. And, in some cases, not until after the defendant's case-in-chief. The court must be able to respond to these situations with appropriate sanctions in the hope of deterring future inadequate filings by the certifying attorney and the trial bar in general. On the other hand, in situations where a complaint or other paper is obviously and recognizably frivolous when filed, or as circumstances lead the court to strongly suspect that a filed paper may not be well-grounded in fact or law, the court

should *at a minimum* provide notice to the certifying attorney that Rule 11 sanctions will be assessed at the end of trial if appropriate. Such early notice in cases of this nature will serve to warn the attorney that he risks incurring substantial sanctions, which will in turn increase the likelihood that meritless claims and motions will be abandoned and additional monetary and judicial resources will be saved. This procedure administers the paramount aim of deterrence and, simultaneously, eliminates the danger of an unsuspected punitive award.

In contexts other than Rule 11, the sanctionable misconduct will, in general, be more immediately recognizable. Consequently, if the purposes of the rules are to be served, the sanctionable behavior should be brought to the immediate attention of the offending attorney. In the event of discovery abuses and other vexatious pretrial behavior, for example, sanctions should be levied contemporaneously with the offending misconduct. The benefit provided by the policy of deterrence is lost if the court postpones imposition until the end of the case. Further, in situations of attorney misconduct occurring during a hearing or trial, the offending attorney should be put on clear and fair notice of possible liability at, or very near, the time that the egregious behavior occurs. We believe it is preferable, however, to reserve final judgment, fixing the amount of the sanctions, until the conclusion of the hearing or trial, as is often done in contempt cases. Such a procedure permits the court to consider, in fixing the amount, the subsequent conduct of counsel and does not divert an attorney from the representation of his client.

It is neither appropriate nor possible for us to address every conceivable situation calling sanctions into play. The circumstances presented in each situation will, quite naturally, be unique and may vary widely. To a certain extent, the optimum timing of the sanctions award will depend on those circumstances. It is critical, however, that the sanctioning court embrace the overriding purpose of deterrence and

mold its sanctions in each case so as to best implement that policy. Effective and sound judicial management includes the duty to impose just sanctions, where appropriate, in a manner which will best advance the underlying goal. The procedure used at bar failed in this respect.

■ In a related vein, we are convinced that the amount of sanctions imposed is not sound. It is clear that the position taken by Judge Real was that substantially all fees incurred by defendants were attributed to Yagman's misconduct. We find that this "round-figure" approach is inadequate. Sanctions must be "reasonable" in amount. This is particularly so where, as here, the amount of the sanction is based upon the attorney's fees claimed by the other party. It is difficult to assess the reasonableness of a lump-sum sanctions award, such as this one, which is intended to cover a myriad of misconduct over a period of time and is based upon a variety of authority. The task becomes impossible when the amount of the lump-sum sanctions award assumes massive proportions.

■ It is crucial, therefore, that a sanctions award be quantifiable with some precision and properly itemized in terms of the perceived misconduct and the sanctioning authority. Different rules, regulations and statutes provide sanctions for different forms of misconduct. For example, section 1927 provides for the recovery of the *excess* attorney's fees incurred as a result of misconduct which multiplies the proceedings. *United States v. Associated Convalescent Enterprises, Inc.*, 766 F.2d 1342, 1347–48 (9th Cir.1985); *see also Zaldivar v. City of Los Angeles*, 780 F.2d 823, 829–30 (9th Cir.1986). Obviously, a blanket award of all fees cannot square with the section's requirement that only excess amounts be allowed. Thus, only if the award is sufficiently itemized can the court be assured that it is reasonable.

■ When the sanctions award is based upon attorney's fees and related expenses, an essential part of determining the reasonableness of the award is inquir-

ing into the reasonableness of the claimed fees. Recovery should never exceed those expenses and fees that were reasonably necessary to resist the offending action. Schwarzer, *supra* at 198. There is no need to rigidly apply the factors set forth in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), but the court must make some evaluation of the fee breakdown submitted by counsel. *Toombs v. Leone*, 777 F.2d 465, 472 (9th Cir.1985). The measure to be used "is not actual expenses and fees but those the court determines to be reasonable." Schwarzer, *supra* at 203. Implicit in this is the duty to mitigate.

In assessing the damage done, the court should consider the extent to which it is self-inflicted due to the failure to mitigate ....

....

... A party having vigorously resisted a baseless claim may therefore find that the court, in making an award, will consider its expenditures to have been excessive.

Schwarzer, *supra* at 200–03. Further, as we have recently noted, Rule 11 "sanctions are not appropriately awarded for any portions of attorney's fees provoked by a moving attorney's misconduct." *Mossman v. Roadway Express*, 789 F.2d 804, 806 (9th Cir.1986), *as amended*.

The district court's award in this case fails in all of these respects. Not only does the court's lump-sum award contravene the policy of deterrence underlying sanctions, it also fails as a post hoc award because it makes no attempt to itemize and quantify the sanctions. Nor does the court purport to scrutinize the $293,000.00 in fees and expenses that defendants claim to have incurred in fighting a lawsuit which they contend was frivolous from the start. Nor does the court consider any misconduct on the part of defense counsel which may have contributed to the protraction of this lawsuit.[21] In addition, the award entirely fails to consider Yagman's ability to pay such an immense sum which, in our view, is another factor relevant in determining reasonableness. *See Colucci v. New York Times Co.*, 533 F.Supp. 1011, 1013 (S.D.N.Y.1982). In short, the district court does not appear to have determined in any way whether the sanctions award complies with the reasonableness requirement and, thus, we hold that the award constitutes an abuse of discretion. By this holding, we do not condone any of Yagman's misbehavior. After reviewing the entire record, we empathize with the district court's desire to punish Yagman's actions. To allow that punishment, however, to take the form of such a generic, all-encompassing, massive, post-trial retribution, with no indication whatsoever of reasonableness, would send shivers through the bar.

■ We also disagree with the district court's application of Rule 11, section 1927 and Local Rule 27.1 to this case, beginning with the court's express finding that Yagman's filing of this complaint was a violation of Rule 11. Yagman argues that the district court erroneously applied the amended Rule 11, when instead the old rule that was in effect at the time the complaint was filed should have been used. Rule 11 was in fact amended during the pendency of this lawsuit and the differences between the two versions of the rule are significant. First, old Rule 11 was governed by a standard of willfulness and subjective bad faith, while the amended Rule 11 utilizes a more stringent standard of objective reasonableness. *Zaldivar*, 780 F.2d at 829. Second, unlike its counterpart, amended Rule 11 expressly provides for sanctions

---

**21.** In response to a pre-trial motion by plaintiffs for sanctions, Judge Lydick ruled:

... defendants' counsel's actions may appear somewhat bizarre, including but not limited to his refusing to serve plaintiffs with the video tape which it seeks to introduce into evidence, but offering to sell a copy of the video tape to plaintiffs instead—and we admonish counsel to comply with Local Rule 7.5.1 regarding the service of evidence and all other applicable rules.

However, plaintiffs' request for attorneys' fees is denied if for no other reason that if this Court were to sanction that remedy in this case on every occasion that it is asked for by these attorneys, the Court would be turned into a veritable counting house.

(Reporter's Transcript, Oct. 31, 1983, p. 6).

based on a reasonable attorney's fee. *Compare United States v. Standard Oil Co. of California,* 603 F.2d 100, 103 n. 2 (9th Cir.1979), *with Mossman v. Roadway Express,* 789 F.2d at 806. Logically, because the charge of both versions of the rule speaks to the time of signing and filing, the older and less harsh Rule 11 should govern this complaint since it was in effect at that time. It would be unfair to saddle Yagman with the additional responsibility and greater liability mandated by the amended rule, which only came into being after the complaint was filed. *See Bradley v. Richmond School Board,* 416 U.S. 696, 720–21, 94 S.Ct. 2006, 2020–21, 40 L.Ed.2d 476, 493 (1974) (application of an old rule is preferred if the new rule imposes unanticipated obligations or increased burdens on the party); *Burgess v. Premier Corp.,* 727 F.2d 826, 840 (9th Cir.1984) (attorneys' fees would not be awarded for conduct not actionable under law at the time of the complaint).

Thus, the district court erred in applying amended Rule 11 in this case.[22] That error is, by itself, of no great consequence, since the district court found that the complaint was filed in bad faith. A finding of bad faith will, if correct, support sanctions under either version of Rule 11. In our view, however, the court's bad faith finding is clearly erroneous.[23] The bad faith finding appears to be based upon three more specific findings made by the district court. In our opinion, these underlying findings do not, either singly or collectively, support a conclusion of bad faith.

▇▇ First, the court found that Yagman and the plaintiffs had little or no knowledge of the actual statements made by defendants before filing the complaint. Knowledge of the actual statements, however, is irrelevant and often impossible in slander cases. What is important is that publication to someone other than the plaintiff be made. The allegedly defamatory statements in this case were undisputedly uttered to persons other than plaintiffs and there is ample evidence that Yagman and the plaintiffs were well aware of the essence of those statements.[24] Further, complaints are routinely filed on information and belief. A finding of bad faith for doing so in this case is clearly wrong.

▇▇ Second, the court concluded that Yagman filed this suit for a two-fold improper purpose of silencing expert witnesses and obtaining a discovery advantage in the underlying Settles civil suit. The plain facts, however, refute both of these purported purposes. The civil suit was filed over six months before the instant defamation action and discovery in the civil suit was progressing during that time. We frankly do not understand, nor is it evident from the record, what discovery advantage would be possible by the filing of this lawsuit. Further, the complaint challenged only extra-judicial, allegedly false, statements of fact. As such, it might chill a witness's zeal to hold a press conference, but it could not "silence" the testimony of these witnesses in any judicial proceeding.

▇▇ Third, the district court held that Yagman should have recognized that the alleged defamatory statements were nonactionable opinion. Although we have upheld the district court's finding that the statements were indeed protected opinion, we do not consider the distinction between

---

**22.** Although the district court did not elucidate which version of Rule 11 it was applying, we can assume the amended rule was used for two reasons. First, it was the rule in effect at the time of decision and was thus presumptively applied. Second, the large sanction award of attorney's fees would be proper, if at all, only under the amended rule.

**23.** We review the factual findings relied upon by the district court to establish a violation of the rule under the clearly erroneous standard. We review the district court's legal conclusion

that the facts constitute a violation of the rule *de novo.* We review the appropriateness of the sanction imposed for an abuse of discretion. *Zaldivar,* 780 F.2d at 828.

**24.** Plaintiff Brown testified that he learned of the doctor's statements when media representatives began contacting him on the day of the press conference. Witness and fellow attorney Inlow Campbell testified that he attended the press conference and told Yagman about it later that day.

fact and opinion to be so clear that merely filing a complaint in these circumstances permits a finding of subjective bad faith. From the plaintiffs' perspective, after being the focus of intense scrutiny and suspicion that they were responsible for Settles' death, a good faith argument can be made that defendants' statements should not be constitutionally protected. The argument need not be correct to be considered made in good faith.

 Consequently, we find no basis for Rule 11 sanctions for the signing of the complaint. Nor do we find a basis for such sanctions in the other two authorities relied on by the district court. Local Rule 27.1 authorizes the imposition of monetary sanctions against an attorney who violates any local or federal rule. Since the complaint was proper under Rule 11, it could not be improper under Local Rule 27.1. Section 1927 does not apply to initial pleadings, since it addresses only the multiplication of proceedings. It is only possible to multiply or prolong proceedings after the complaint is filed. *Zaldivar*, 780 F.2d at 831.

The district court also details a significant number of acts and omissions committed during the pre-trial phase of the case. They generally fall into two categories: (1) discovery abuses; (2) failure to prepare or otherwise cooperate in Rule 16 management.

 Yagman committed a number of discovery abuses, such as failure to produce and refusal to answer deposition questions. Sanctions for discovery abuses are governed primarily by Rule 26(g) and Rule 37, rather than Rule 11, of the Federal Rules of Civil Procedure.[25] These rules are sufficiently comprehensive to leave no room for a discovery abuse sanction based upon a local rule violation. Also, section 1927 is not appropriate for use in these circumstances. Sanctions under Rules 26 and 37 come into play when there is a violation of the rules, as at bar; damages under section 1927 are appropriate where there is no obvious violation of the technical rules, but where, within the rules, the

proceeding is conducted in bad faith for the purpose of delay or increasing costs. Thus, while authority existed under Rules 26 and 37 to punish Yagman for discovery abuses, as was done on occasion, it did not exist under the authority used by the district court.

Rule 16(f), Fed.R.Civ.P., provides for sanctions, including a reasonable attorney's fee, for failure to prepare for scheduling conferences and failure to cooperate in pretrial orders. Rule 11 does not apply in this situation. Further, Rule 16 is narrower than Local Rule 27.1, which authorizes monetary sanctions for the violation of any federal rule, whether the federal rule itself authorizes sanctions or not. In our view, the sanctions imposed by the district court may have been sustainable under Rule 16, but not Rule 27.1. Finally, section 1927 might be a basis for imposing sanctions for the failure of Yagman to prepare, but there has been no showing how any such failure resulted in a delay or multiplication of the proceedings. The court and defense counsel were obviously exasperated by Yagman's "cavalier" conduct, but section 1927 sanctions must be based upon a more particular showing consistent with the force and purpose of the statute.

The district court further purported to sanction Yagman for his conduct at trial. The conduct of counsel during the course of trial has not been made the subject of a formal set of rules. Of course, the rules of evidence and various local rules regarding counsel conduct may be relevant, as well as the whole range of ethical obligations of an attorney. In any event, the district court did not point to specific rules which Yagman violated during the course of the trial. Rather, the court is critical of Yagman's tactical decisions, lack of preparation, groundless objections, and incessant quibbling. After reviewing the record, we sympathize with the court's reaction to Yagman's trial conduct but, under the circumstances, we must regard it as merely the last straw, following a pre-trial history of offensive and obstreperous conduct.

---

**25.** Discovery motions made after August 1, 1983 fall within the ambit of amended Rule 11. *See*

Advisory Committee Notes, 97 F.R.D. 198, 201 (1983).

The court cannot, as it purported to do, sanction Yagman's "total conduct" under Local Rule 27.1. Reference to specific federal rule violations must be made. Nor can the court sanction trial conduct under section 1927 without more specific findings as to the exact misconduct which multiplied the proceedings and the amount of "excess costs, expenses, and attorney's fees" occasioned by the misconduct. We note further that Rule 11 sanctions are obviously inappropriate in this context, and the district court did not purport to exercise its contempt powers or invoke sanctions based upon its inherent power to punish abusive litigation practices. *See Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

Consequently, we reverse the district court's sanctions award against Yagman. On remand, the court may reconsider whether any of Yagman's actions during the trial warrant sanctions under a proper exercise of sanctioning authority. Obviously, Rule 11 sanctions for the filing of this complaint should not be reconsidered and it is too late in the day to impose sanctions for Yagman's pre-trial conduct.[26]

Yagman has requested that the action be remanded to a different district judge. This type of relief is exceedingly rare. "In the absence of proof of personal bias, we remand to a new judge only under 'unusual circumstances.'" *United States v. Sears, Roebuck & Co., Inc.,* 785 F.2d 777, 780 (9th Cir.1986) (citations omitted). We have firmly rejected Yagman's claims of judicial bias and, thus, are hesitant to grant this extraordinary relief. We do not doubt Judge Real's ability to act fairly. We grant this relief, however, because we believe it is necessary to preserve the appearance of justice. This case has had an unbecoming quality from its beginning. We do not appreciate nor condone the attorney bickering and misconduct which has pervaded the action and which spawned the district court's ire. Nevertheless, the mas-

sive sanction award and the numerous allegations of bias and overreaching have combined with this poor lawyering to produce an entirely unfortunate end result: the fragile appearance of justice has taken a beating. It is time to conclude the matter as quickly and as painlessly as possible. We feel this can best be accomplished by a new, randomly selected judge. Because the question on remand is limited, any duplication of effort and waste will be minimal.

AFFIRMED IN PART and REVERSED IN PART and REMANDED with instructions that this case be randomly reassigned.

Each party to bear its own costs.

---

**26.** By this decision we are not deciding the propriety of a *respondeat superior* sanctions

award against the professional corporation.