**Louis J. DAMIANI and Ronald Herrington, dba Plantation Coal & Land Co., Plaintiffs,**

**v.**

**Linda ADAMS, et al., Defendants.**

**Civ. No. 85–1834–R (IEG).**

United States District Court,
S.D. California.

March 17, 1987.

Louis J. Damiani, et al., pro se.

Donald McGrath II and Cynthia P. Garrett, San Diego, Cal., for defendants.

RHOADES, District Judge.

On April 10, 1986, the Court filed and entered an order granting either summary judgment or dismissal of the complaint as to all of the defendants in this action; the same order denied motions by the plaintiffs for leave to file an amended complaint and for an order substituting an executrix for a deceased defendant. A further hearing on certain of the defendants' motions for sanctions and injunctive relief against the plaintiffs was held on May 19, 1986. At the May 19, 1986, hearing, the Court indicated that it intended to grant the defendants' motions. This Memorandum Decision expounds upon the reasons for the Order of April 10, 1986, orders the imposition of sanctions, and grants the injunctive relief sought by the defendants.

Issuance of this Memorandum Decision and Order was delayed due to the filing by the plaintiffs of a civil action in the Central District of California which named Judge Rhoades, among a number of other judges and attorneys, as a defendant. The Court felt that while it was not obligated to refrain from issuing this order, a delay was appropriate while the Central District case was before Judge Keller. That matter having been resolved in favor of the judicial officers named in the complaint, the Court believes that no further purpose is served in withholding publication of this decision and order.

### BACKGROUND

Plaintiffs,[1] who have proceeded *in pro se*, brought the instant action against some twenty-six individual defendants ("Defendants"). They invoked the jurisdictional basis of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1961 *et seq.* While the complaint is far from a model of clarity, its thrust is that Defendants, who include judicial officers and numerous attorneys, conspired to deprive the Plaintiffs of certain real property located in Monongalia County, West Virginia, and the mineral rights associated with that property. The alleged "continuing conspiracy" purportedly en-

---

1. Plaintiff DAMIANI died in July, 1986. Although no formal papers have been submitted, it is the court's understanding that Mr. DAMIANI's executrix is now prosecuting this lawsuit.

compasses virtually the entire court system of Monongalia County. It includes judges, court personnel, attorneys practicing in those courts, law enforcement officers, and other persons who have been involved in one way or another in the many lawsuits Plaintiffs have filed. Various types of "racketeering activities" are alleged, such as mail fraud, wire fraud, extortion, interference with interstate commerce, and perjury.

From the information presented to the Court on these motions, it appears that the underlying property transactions began in 1975, when plaintiff DAMIANI, and other persons apparently residing in California ("DAMIANI's group"), began negotiations with plaintiff HERRINGTON for the purchase by DAMIANI's group of some real property HERRINGTON had acquired by inheritance sometime prior to 1975. The property consisted of some 371 acres; however, DAMIANI's group only sought to purchase a 62 acre tract for purposes of mining coal. HERRINGTON and DAMIANI's group entered into an agreement for the purchase and sale of the 62 acre tract. Defendants TOMASKY and FRIEND were retained as attorneys by HERRINGTON in connection with this proposed transfer.

This transaction was never consummated. Instead, HERRINGTON entered into negotiations with the principals of a West Virginia corporation, Met Coal & Coke, Inc. ("MET"), for the transfer of the entire 371 acres. Although subsequently subject to extensive litigation, the upshot of these negotiations was that during 1976, MET became the owner of the entire 371 acres.

Plaintiffs allege that during the 1975–1976 period another transaction occurred between HERRINGTON, on the one hand, and defendant TOMASKY, on the other. Plaintiffs allege that HERRINGTON, relying upon the trust relationship between attorney and client, loaned TOMASKY $100,000.00 in cash. In the instant case and in other actions, Plaintiffs have made various allegations about this aspect of the lawsuit, including claims that HERRINGTON was induced into entering the arrangement as a means of defrauding the Internal Revenue Service. At their core, however, Plaintiffs' allegations are that TOMASKY committed theft by fraud by submerging a proposed repayment of the $100,000.00 loan into the transaction that resulted in MET acquiring title to the 371 acre tract.

Beginning in 1977, DAMIANI and HERRINGTON were parties in a lengthy series of lawsuits. Usually one or the other was a plaintiff, and often the two men were, at least formally, on opposite sides of a case. Of the fifteen legal actions examined by this Court, ten involve issues related to the two "core" events described above, the transfer to MET of the 371 acres and the alleged $100,000 loan to TOMASKY. The remainder include malicious prosecution and abuse of process suits brought by HERRINGTON against defendants EDWARD HEFLIN and HAROLD WEISS; a habeas corpus petition by a person who apparently is HERRINGTON's son (not a party in this action) against defendant JOSEPH JANCO; a civil rights action filed by DAMIANI against defendant COSTIANES HALL; and a false arrest case HERRINGTON brought against an entity not a party to this action.

Two of these fifteen legal actions are of particular interest in the instant case: *Ronald Herrington v. Michael Tomasky, L. Edward Friend, II, Jasper Petitte, Wayne Fortney, Jr., and Met Coal and Coke Co.,* Civil Action No. 78–C–711 ("No. 78–C–711"), filed in the Monongalia County Circuit Court in October, 1978, and *Ronald Herrington v. Met Coal and Coke Company,* Civil Action No. 79–C–222 ("No. 79–C–222") filed in the same court in March, 1979.

*Case No. 78–C–711*

Case No. 78–C–711 went to trial by jury in November, 1979, with Judge DEPOND (a defendant in the instant lawsuit) presiding. The pretrial order set out the following issues for trial:

(a) Whether or not Ronald Herrington delivered the sum of $100,000.00 to Michael Tomasky, as is evidenced by a note purportedly executed by Michael Tomasky.

(b) Did the defendants Tomasky and Friend, or either of them, make any

fraudulent inducements to the damage of Ronald Herrington by reason of Herrington's conveyance of certain real estate located in Monongalia County, West Virginia, and, if so, what are the damages of Ronald Herrington?

(c) Was the deed executed by Ronald Herrington, bearing date the 28th day of June, 1976, whereby certain real estate was conveyed to Met Coal and Coke, Inc., valid? If said deed is valid, there is no issue of usury in this case and, conversely, if the deed was not valid, was the transaction between Herrington and Met Coal and Coke, Inc., usurious?

(d) Did the plaintiff Herrington breach his covenants of general warranty and quiet enjoyment by bringing this civil action against Met Coal and Coke, Inc., and, if so, what are the damages of Met Coal and Coke?

Page 3 of the October 29, 1979, Order in No. 78–C–711.

Defendant AMOS represented HERRINGTON, defendant UNDERWOOD represented TOMASKY and FRIEND, and defendant HEISKELL represented MET, PETITTE and FORTNEY.

The jury returned a verdict on November 9, 1979. It found that TOMASKY was "not guilty", that HERRINGTON was not entitled to recover any damages on the basis of fraud on the part of any of the defendants, and that the HERRINGTON–MET deed was a valid deed.

*Case No. 79–C–222*

Case No. 79–C–222 was a declaratory relief action in which HERRINGTON sought to have the "MET deed" reformed and given the legal effect of a mortgage. The case was heard without jury by Judge STARCHER, also named as a defendant in this lawsuit. After denying each side's motion for summary judgment, Judge STARCHER held the trial beginning in October, 1980. By agreement of the parties, he took judicial notice of the entire record of No. 78–C–711 to supplement the evidence and exhibits received in the trial before him.

On May 27, 1982, Judge STARCHER issued a Memorandum Order finding that the HERRINGTON–MET agreement was a deed, with an option held by HERRINGTON to repurchase, and not a deed of trust, or mortgage. The Order further stated that since HERRINGTON failed to exercise his option to repurchase within the period allotted by the agreement, the deed operated as an absolute conveyance of the property to MET.

HERRINGTON'S petition for an appeal from the judgment in No. 78–C–711 was denied by the West Virginia Supreme Court of Appeals in September, 1980. In January and September, 1983, the same court denied two separate petitions for appeal from the judgment in No. 79–C–222. In April, 1984, the United States Supreme Court denied HERRINGTON's petition for a writ of certiorari in No. 79–C–222.

As previously mentioned, Plaintiffs were involved in numerous other lawsuits related to the transfer of the 371 acres. For example, in *Shirley Herrington v. Ronald Herrington,* Monongalia County Circuit Court No. 9347, SHIRLEY HERRINGTON, HERRINGTON's former wife, succeeded in having two deeds recorded by HERRINGTON declared null and void. These deeds purported to convey SHIRLEY HERRINGTON's one-half undivided interest in certain parcels of the 371 acres as a gift to HERRINGTON. SHIRLEY HERRINGTON's counsel was S.J. ANGOTTI. Both are named as defendants in the present action, as well as the presiding judge (DEPOND) and the third-party defendant's (MET) attorney, HEISKELL.

Another related case, *Louis Damiani v. Michael Tomasky, L. Edward Friend, II, Continental Insurance Co. aka CNA, Ronald Herrington, Martha Patterson,* Civil Action No. 77–0085–C ("No. 77–85–C"), was filed in the U.S. District Court for the Central District of California, but was promptly transferred to the Northern District of West Virginia. DAMIANI alleged in his complaint that HERRINGTON defrauded him of $50,000.00 by falsely representing that a grant deed to 121.125 acres of HERRINGTON's West Virginia real property, securing a $50,000 debt, had been properly recorded. This property was part of the 371 acres subsequently sold to MET.

The complaint in No. 77–85–C included allegations that TOMASKY and FRIEND conspired with HERRINGTON to defraud DAMIANI. Similar, albeit less clear, claims are made against PATTERSON, a former friend of HERRINGTON.

HERRINGTON confessed judgment in the amount of $56,700.00. DAMIANI moved for a default judgment as to PATTERSON, but that motion was denied by the district court.

Summary judgment was entered in favor of TOMASKY, FRIEND, and their insurer on the basis of DAMIANI's admission that he had no attorney-client relationship with the individual defendants. Further, the district court relied upon the preclusive effects of the state court judgments described above. The district court's judgment was upheld on appeal by the Fourth Circuit Court of Appeals, which noted in an unpublished opinion that DAMIANI had, in effect, already pursued his fraud claims against TOMASKY and FRIEND through the state court actions on behalf of DAMIANI's closely-held corporation, PLANTATION COAL & LAND CO. Those cases, Nos. 78–C–454 and 80–C–349, were resolved in favor of the defendants.

At this point, it will suffice to note that of all the lawsuits reviewed by the Court, in only one could a plaintiff in the instant action be viewed as having been a "prevailing party", and that action bears little or no relation to the core events underlying the plaintiffs' conspiracy theories. In *Ronald Herrington v. Harold Weiss*, Civil No. 81–0043–N(M), U.S. District Court, Southern District of California, HERRINGTON alleged that WEISS, a jeweler who formerly resided in Monongalia County, without having reasonable or probable cause, caused an arrest warrant to be issued for HERRINGTON for issuing a worthless check. The record shows that HERRINGTON and WEISS settled out of court, with WEISS' insurer paying HERRINGTON $10,000.00, and the case was dismissed pursuant to Federal Rule of Civil Procedure 41(a). Still, WEISS is alleged to be a part of the RICO conspiracy involved in this action.

Defendants are aligned in three groups, as described in the order of April 3, 1986. Hereinafter, the use of UNDERWOOD, FORTNEY, or STARCHER will refer to all the defendants named in the April 3d order as members of their respective group, unless otherwise indicated. Similarly, unless otherwise stated, the orders as to the FORTNEY group will apply to defendant HEISKELL.

DISCUSSION

A. MOTIONS FOR SUMMARY JUDGMENT

The initial moving papers submitted by the UNDERWOOD and FORTNEY groups in support of their respective motions to dismiss included a number of exhibits. These exhibits relate to the prior litigation involving the 371 acres formerly owned by HERRINGTON. Because these previous cases appeared to involve the central issues in this action, and had reached, in some instances, determinations upon the merits of Plaintiffs' claims here, the Court chose to treat the UNDERWOOD and FORTNEY motions as motions for summary judgment. Fed.R.Civ.P. 12(b), 56. The parties did not object to this procedure. The Court set a further briefing schedule, and the parties filed additional briefs and exhibits relating to the summary judgment motions.

Counsel for the UNDERWOOD group, apparently acting as a *de facto* "lead counsel" for Defendants, submitted a voluminous declaration in support of the motion. This declaration contains certified copies of numerous actions previously filed by, or against, Plaintiffs. In exhaustive detail, the exhibits to the declaration cover the tortuous, and torturous, course followed by plaintiffs in their attempts to somehow reverse the sale of the 371 acres to the company owned by the FORTNEY group.

Plaintiffs' opposition to the factual submissions of Defendants was meager, consisting of declarations from each of the plaintiffs, and disjointed, isolated extracts from various transcripts, some of which were inadequately identified. After examining the materials presented by both sides, the Court found that summary judgment in

favor of Defendants was appropriate pursuant to Federal Rule of Civil Procedure 56(e). Plaintiffs' response essentially "rests upon the mere allegations" of their complaint, rehashed in the form of declarations. However, in deference to Plaintiffs status as *pro se* litigants, the Court elected to go beyond the procedural deficiencies and weigh the question of whether triable issues of fact remained.

The summary judgment motions were based on Defendants' contentions that Plaintiffs' claims were barred by application of the doctrines of *res judicata* or collateral estoppel because these claims had been litigated to a final determination on the merits in previous actions. As noted above, the West Virginia actions No. 78–C–711 and 79–C–222 seem to be the keystones of Defendants' arguments. Accordingly, the motions stand or fall upon the question of whether the present claims and/or issues were fully litigated before.

The complaint is based upon the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. section 1961, *et seq.* ("civil RICO"). The gravamen of the complaint is that Defendants formed a wide-ranging conspiracy to injure Plaintiffs' business interests, specifically with regard to their ownership and use of the 371 acres. Plaintiffs allege that members of the conspiracy gained control of the court system of Monongalia County, West Virginia, and used this control to "defraud plaintiffs of their coal land". The requisite predicate acts are alleged to be "numerous acts of mail and wire fraud".

Case No. 78–C–711 was tried to a jury. The specific issues submitted to the jury are set out above. The jury found that TOMASKY and FRIEND (UNDERWOOD group members here) did not defraud HERRINGTON of the 371 acres, that TOMASKY was "not guilty" of defrauding HERRINGTON of $100,000.00, and that the deed executed by HERRINGTON transferring the 371 acres to the FORTNEY group's company was valid. HERRINGTON appealed this verdict through the West Virginia courts. His appeal was denied by the West Virginia Supreme Court.

The judgment of No. 78–C–711 appears to have been reinforced by that in No. 79–C–222, the declaratory relief action filed by HERRINGTON seeking reformation of the deed into a mortgage. In that action, the court considered the entire record of No. 78–C–711 plus additional evidence submitted by the parties. Contrary to the assertions of Plaintiffs, it does appear that the judge presiding over No. 79–C–222 (STARCHER) received into evidence all the materials offered by HERRINGTON before issuing his decision. Judge STARCHER rejected HERRINGTON's claims, and upheld the validity of the deed. Again, HERRINGTON's appeals were denied.

■ In conjunction with the other factual materials submitted in support of these summary judgment motions, the results of Nos. 78–C–711 and 79–C–222 eviscerate Plaintiffs' RICO claims. DAMIANI's claims regarding his injuries as a result of his loss of the 371 acres are derivative, arising from his alleged contract for its sale to his group with HERRINGTON. The verdicts, after trial, were that no fraud was committed in the transfer of the property. Plaintiffs may not resurrect these claims by retitling them as RICO predicate acts. The issues relating to the property transfer were decided and put to rest long ago. As to these, there are no triable issues of fact, and summary judgment must be granted to Defendants.

■ Plaintiffs have also alleged other injuries inflicted upon them by the purported conspirators through their "control" of the Monongalia County courts. After reviewing all the submissions by the parties, and giving Plaintiffs the benefit of all reasonable inferences, the Court could find no specific facts supporting this conspiracy theory. The Plaintiffs have had ample opportunity, in this action and in previous lawsuits, to present a factual showing of their allegations of the supposed conspiracy's pervasive and adverse influence upon the Monongalia County courts, but have not done so. Absent specific facts, this Court cannot find any basis for permitting further litigation of Plaintiffs' conclusory and unsupported claims. All the factual

material before the Court negates the existence of Plaintiffs' conspiracy theory, and supports the granting of Defendants' motions.

### B. MOTIONS TO DISMISS

■ Defendants STARCHER and GARLOW filed motions to dismiss for lack of personal jurisdiction and improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3). While Plaintiffs cited a flurry of cases in opposition, the Court found the citations inapposite, as none addressed jurisdiction in a RICO context.

The initial requirement which must be met to confer personal jurisdiction in a RICO action is set out in 18 U.S.C. § 1965(a):

> Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

Plaintiffs failed to controvert the affidavits of STARCHER and GARLOW, which plainly show that these defendants do not reside, may not be found, do not have an agent, and do not transact their affairs in the Southern District of California. The focal point of Plaintiffs' claims against all defendants, including STARCHER and GARLOW, is in the Northern District of West Virginia. Neither jurisdiction nor venue as to the claims against STARCHER and GARLOW lies in San Diego. Their motions were well-taken and were accordingly granted.

### C. MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

Plaintiffs' motion for leave to file an amended complaint was heard in conjunction with Defendants' motions. The proposed amended complaint essentially repeats the allegations of the original complaint, but adds some twenty-five defendants to Plaintiffs' ever-expanding theory of a conspiracy dedicated to harming their interests.

■ While it is true generally that leave to amend under Rule 15(a) is liberally granted, the proviso contained in the rule is that leave shall be given when "justice so requires." The district courts retain discretion to deny leave to amend when the movants seek the amendment for improper purposes, or when undue prejudice would result to the opposing parties. *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In light of the circumstances of this case, as set forth in this Memorandum, the Court concluded that an amendment would not serve the interests of justice.

■ In brief, as noted below, Plaintiffs' purposes in initiating this lawsuit are, at best, suspect. To allow Plaintiffs to include more defendants in their unwarranted claims would serve only to compound the costs and inconvenience incurred by the present defendants. Moreover, the Court has decided that an end must be made to Plaintiffs' incessant harassment of apparently anyone who they perceive as standing in their way. For all of the above reasons, the motion for leave to file an amended complaint was denied.

### D. MOTIONS FOR INJUNCTIVE RELIEF AND SANCTIONS

The FORTNEY group brought motions for an injunction from repetitive litigation pursuant to 28 U.S.C. § 1651, and for an award of sanctions, including costs and attorneys' fees, against Plaintiffs. These motions were subsequently joined by the UNDERWOOD group, and by defendant HEISKELL. In general, the bases for these motions rest upon the record of the litigation initiated by Plaintiffs, and the inferences as to purpose and motive which Defendants argue should be drawn from that record.

#### 1. *Injunction*

■ Three recent Ninth Circuit decisions dealing with similar factual and legal situations guide the Court's decision as to the motion for injunctive relief. In each case, a district court issued an injunction that barred a plaintiff from continuing a pattern of bringing repetitious litigation. These cases point out that the district courts possess discretionary power to issue such an injunction when it is shown that a plaintiff

has repeatedly forced defendant to contest the same, or substantially the same, frivolous or previously litigated claims and issues. *De Nardo v. Murphy,* 781 F.2d 1345, 1348 (9th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 1962, 90 L.Ed.2d 648 (1986); *Cook v. Peter Kiewit Sons Co.,* 775 F.2d 1030, 1032–1036 (9th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2919, 91 L.Ed.2d 547 (1986); *Wood v. Santa Barbara Chamber of Commerce,* 705 F.2d 1515, 1523–1524 (9th Cir.1983) *cert. denied,* 465 U.S. 1085, 104 S.Ct. 1446, 79 L.Ed.2d 765 (1984).

■ These three cases stress that the issuance of an injunction is not a remedy which should be used as a matter of course, but is a "last resort" to be considered when it is clear that a plaintiff cannot be dissuaded by "traditional" means from a course of conduct which severely harasses and injures a defendant.

■ In the earlier sections of this Memorandum, Plaintiffs' legal activities since 1975 with regard to various defendants were outlined. As noted, with one exception, the record before the Court shows that Plaintiffs have been unsuccessful. The obvious inference to be drawn from the series of lawsuits filed by Plaintiffs subsequent to the judgments and unsuccessful appeals in Nos. 78–C–711 and 79–C–222 is that they seek to harass or punish those involved in the 371 acre transfer. Along the way, they tend to lump anyone, or any entity, into the "conspiracy" which allegedly seeks to do them harm.

In the number of actions brought by Plaintiffs, and the apparent vindictive nature of these cases, this lawsuit most closely parallels the facts of the *Wood* case (in contrast, *De Nardo* involved three lawsuits over six years, and *Cook* dealt with three lawsuits in one year). Like *Wood,* the plaintiffs here lost on the merits in their early cases, but repeatedly filed against the same defendants in various forums on the same claims and issues.

In sum, the Court finds that Defendants have established that they have been subjected to repetitive and increasingly meritless litigation by these plaintiffs. Based upon their "track record", it also seems highly unlikely that Plaintiffs would be dissuaded from continuing this pattern of conduct by any means short of a court order. Accordingly, Defendants' motion for a permanent injunction from repetitive litigation is granted, under the terms and conditions set forth below.

### 2. Sanctions

■ Beyond the motion for an injunction, Defendants also seek an award of sanctions under Federal Rule of Civil Procedure 11. Reference was made in the FORTNEY group's supplemental memorandum to 28 U.S.C. § 1927 as a basis for a sanctions' award of attorneys' fees. Sanctions under section 1927, however, may be imposed only against attorneys and not parties. *See, e.g., Zaldivar v. City of Los Angeles,* 780 F.2d 823, 831 (9th Cir.1986). In deciding this question, this Court relied instead upon Federal Rule of Civil Procedure 11.

Rule 11 mandates the imposition of sanctions where an attorney or party has signed pleadings, motions or other papers that are frivolous or without merit, or which were filed for an improper purpose, such as to harass, vex or delay an opponent or the course of the litigation. The Rule is clear: If a court finds that the papers are frivolous or interposed for an improper purpose, then the court "shall impose" sanctions, which may include costs and a reasonable attorney's fee.

### a. *Frivolous Papers*

■ The Ninth Circuit has adopted the standard applicable for the award of fees to prevailing defendants in litigation under the civil rights acts to determine whether a pleading or other paper is without merit or frivolous. In *Zaldivar v. City of Los Angeles, supra,* 780 F.2d at 831, the court stated:

> [W]e affirm that Rule 11 sanctions shall be assessed if the paper filed in district court and signed by an attorney *or an unrepresented party* is frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith. (emphasis added).

The standard adopted by the Ninth Circuit thus does not require that the litigant have acted in "subjective bad faith". The papers are to be judged by an objective standard. *Id.* at 831–832.

■ Applying this standard to the instant lawsuit, this Court finds that the legal arguments proffered by Plaintiffs are frivolous on their face. They have presented legal arguments already aired, and rejected, in numerous other lawsuits. If anything, the papers submitted by Plaintiff's are indicative of *subjective* bad faith.

### b. *Improper Purpose*

■ Like the test for determining the merit of a party's legal argument, the Ninth Circuit has adopted an objective standard for determining whether the papers are interposed for an improper purpose. *Id.* at 832. The *Zaldivar* court stated that:

> [w]ithout question, successive complaints based upon propositions of law previously rejected may constitute harassment under Rule 11.

*Id.* The court then elaborated upon this:

> For a claim of harassment to be sustained on the basis of successive filings, there must exist an identity of parties involved in the successive claim, and a clear indication that the proposition urged in the repeat claim was resolved in the earlier one.

*Id.* at 834.

The Court concludes that the standard adopted by the Ninth Circuit fits the facts of the instant case like a glove. The list of defendants in the instant action reads like a well-worn litany. The litigation history recounted in previous sections of this decision underscores the fact that Plaintiffs have filed one lawsuit after another against the same parties; the only newly-named parties in any given lawsuit appear to be the court officers from the immediately preceding action.

Moreover, Plaintiffs' claims have repeatedly been rejected. Undaunted by each previous adverse ruling, the Plaintiffs have sought out a new, and which they hope will be a more favorable forum.

Plaintiffs apparently refuse to take "no" for an answer.

Finally, the fact that Plaintiffs chose this District in which to file this lawsuit lends credence to the conclusion that they seek to discomfit Defendants, as Plaintiffs could not have found a forum in the contiguous 48 states that is more distant from the original West Virginia forum.

Accordingly, the Court concludes that Plaintiffs have interposed papers in this action for the improper purpose of harassing Defendants.

### c. *The Amount of the Sanctions*

Once a court determines that a violation of Rule 11 has occurred, its mandate is clear: The court "shall impose" sanctions. These sanctions may include costs and a reasonable attorney's fee. Fed.R.Civ.P. 11.

Counsel for Defendants have submitted affidavits in support of their request for costs and attorneys' fees. *See* Second Supplemental Declaration of Mark S. Lee (counsel for FORTNEY Group), filed April 24, 1986; Declaration of Cynthia Purcell Garrett (counsel for UNDERWOOD Group), filed April 25, 1986; and supplemental Declaration of Michael I. Lipman (counsel for HEISKELL), filed April 25, 1986. The Court has determined that costs and attorneys' fees shall be imposed as indicated below.

■ In reaching the figures for each award, the Court considered the factors set out in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). In particular, as to the UNDERWOOD Group, the Court notes that their counsel undertook the task of researching Plaintiffs' litigious past and compiling the extensive documentation central to the motions for summary judgment.

■ Other factors considered by the Court which are pertinent to the issue of the amount of sanctions include the rates charged by counsel, which are reasonable and in line with those commonly billed in this area, the geographic separation of defense counsel and their clients and the na-

ture of this case and the particular plaintiffs involved. A consideration of all of these factors supports granting the Defendants' requests in full.

However, an additional factor a court must consider in determining the reasonableness of an award of attorney's fees is the plaintiffs' ability to pay the sum. *Matter of Yagman,* 796 F.2d 1165, 1185 (9th Cir.1986). The total sum requested by the attorneys in the instant case is only about one-seventh of the "immense sum" of $293,000.00 in fees that the *Yagman* court found unreasonable. Nevertheless, this court feels that in light of Plaintiffs' present circumstances, and the injunction the Court has ordered, granting the requests for fees in full would serve little purpose. Accordingly, the court will adjust the fees requested by Defendants proportionately.

The court is cognizant of Plaintiffs' status as *pro se* litigants. In some instances, a plaintiff's *pro se* status might warrant a court's refusal to impose any costs or attorney's fees. *See, e.g., Mitchell v. Office of Los Angeles County Superintendent of Schools,* 805 F.2d 844 (9th Cir. 1986). However, *Mitchell* is easily distinguishable from the instant case. In *Mitchell,* after he had received an EEOC "probable cause" determination, the plaintiff filed a federal suit alleging employment discrimination against the Superintendent of Schools and others. After the plaintiff presented his case, the district court dismissed the action with prejudice. After the defendants had brought a motion for attorneys' fees on the ground that Mitchell had filed his suit in bad faith, the district court awarded $72,993.75 to the defendants.

The Ninth Circuit reversed the award of attorneys' fees on appeal. After first noting that "the plaintiff is the 'chosen instrument of Congress' for vindication of Congressional policy," the court reasoned:

Moreover, it would certainly not serve 'the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII,' *Christianburg,* [*Garment Co. v. Equal Employment Opportunity Commission*], 434 U.S. [412] at 422, 98

S.Ct. at 701 [54 L.Ed.2d 648 (1978)], to uphold an award of $72,933.75 in fees against a plaintiff like Dr. Mitchell who, in propria persona, pursues a case of the type involved here. Such an award after a trial lasting only two and one-half days would bode ill for plaintiffs pursuing more complex claims requiring more time in court for the presentation of their evidence and rebuttal of defendants' claims. The chilling effect upon civil rights plaintiffs would be disporportionate to any protection defendants might receive against the prosecution of meritless claims.

*Id.* at 848.

No such equitable considerations are involved in the instant law suit. Rather, this lawsuit more closely parallels the facts of *Wood v. McEwen,* 644 F.2d 797 (9th Cir. 1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1437, 71 L.Ed.2d 654 (1982), where the court awarded attorney's fees against a *pro se* litigant after he had filed thirty-seven actions that repeatedly raised the same claims, and had "become burdensome and costly to the litigants." *Id.* at 802. *See also Cook v. Spillman,* 806 F.2d 948 (9th Cir.1986).

Accordingly, as to the motions for an injunction against repetitive litigation and for sanctions, *the Court orders:*

1. *INJUNCTION.* That the plaintiffs herein, the Executrix of LOUIS J. DAMIANI and RONALD J. HERRINGTON, formerly dba PLANTATION COAL & LAND CO., their agents, representatives, assigns, heirs, employees, servants, and attorneys, be, and hereby are, permanently enjoined and restrained from filing, bringing, or otherwise instigating, any legal or equitable action, of any type, in any court or administrative agency in or of the United States, or any State of the United States, which is based upon the transfer of 371 acres, more or less, of real property located in the Cass District, Monongalia County, West Virginia, from RONALD HERRINGTON to Met Coal and Coke, Inc., by deed dated June 28, 1976, against any of these moving defend-

ants. It is further ordered that these plaintiffs, their agents, representatives, assigns, heirs, employees, servants, and attorneys, shall not file, bring, or instigate any legal or equitable action against any of these moving defendants, their attorneys, or Court personnel based upon the factual and legal issues involved in this action, including any reasonable attempts by Defendants to recover the attorneys' fees and costs awarded against Plaintiffs. *It is further ordered* that Plaintiffs shall not file, bring, or instigate any legal or equitable action based upon the above-described acts or issues against any person, corporation, organization, or agency, without the express permission of this Court, or of a District Court of the United States having jurisdiction over the proposed action.

2. *SANCTIONS.* That pursuant to the provisions of Federal Rule of Civil Procedure 11, the plaintiffs herein, LOUIS J. DAMIANI and RONALD HERRINGTON, formerly dba PLANTATION COAL & LAND CO., pay, jointly and severally, as sanctions, the sums indicated to the following defendants, through their attorneys of record:

(a) As to defendants WAYNE FORTNEY, SR., WAYNE FORTNEY, JR., JASPER PETITTE and JOHN PETITTE, the plaintiffs shall pay the sum of $2,479.31;

(b) As to defendant EDGAR F. HEISKELL, the plaintiffs shall pay the sum of $581.94;

(c) As to defendants HERBERT G. UNDERWOOD, WILLIS O. SHAY, SHIRLEY HERRINGTON, EDWARD A. HEFLIN, MARTHA PATTERSON (also known as MARTHA MARTIN), L. EDWARD FRIEND, II, JOSEPH KUDLA, MICHAEL TOMASKY, PAUL DAPNICKY, ROBERT DINSMORE, HAROLD WEISS, S.J. ANGOTT, JOSEPH JANCO and CHARLES J. WHISTON, the plaintiffs shall pay the sum of $4,438.75.

3. *SERVICE.* That the U.S. Marshal serve a copy of this Memorandum Decision and Order upon the Plaintiffs in this action:

Lenore Damiani, Executrix of Louis J. Damiani, and Ronald Herrington.

IT IS SO ORDERED.