SUPER POWER SUPPLY,
INC., Plaintiff,

v.

MACASE INDUSTRIAL CORP.,
et al., Defendants.

No. CV 93–6781 WJR (Sx).

United States District Court,
C.D. California.

March 11, 1994.

Peter S. Hwu, David W. Williams, City of Industry, CA, for plaintiff.

Agemian & Fang, Pasadena, CA, Lathrop & Villa, Redondo Beach, CA, for defendants.

## MEMORANDUM AND ORDER

REA, District Judge.

On December 16, 1993, the Court conducted a hearing on plaintiff Super Power Sup- ply, Inc.'s ("Super Power") application for a preliminary injunction. At that time, the Court denied the application and indicated to the parties that it was gravely concerned with the behavior of Super Power's counsel, Peter S. Hwu of the Law Offices of Peter S. Hwu, in connection with Super Power's applications for temporary restraining orders and the preliminary injunction, and invited counsel for defendant Macase Industrial Corp. ("Macase–Taiwan" or "Macase") to file a motion for sanctions. Thereafter, on December 28, 1993, defendant filed its motion for sanctions.

After having reviewed the papers submitted in regards to both plaintiff's application for a preliminary injunction and defendant's motion for sanctions, the contents of the file in this case, and the applicable authorities, the Court denies plaintiff's application for a preliminary injunction and finds that plaintiff's counsel should be sanctioned for violating his obligations as an officer of the court.

## I. BACKGROUND

Super Power filed the instant action on November 9, 1993, alleging numerous state law claims and counterfeiting in violation of the Lanham Trade–Mark Act, 15 U.S.C. § 1051 *et seq.*, against defendant Macase– Taiwan and several individual defendants. On November 17, 1993, Super Power filed a nearly identical complaint in the District Court for the Northern District of Georgia, *Super Power Supply, Inc. v. Macase Industrial Corp.,* Case No. 93–CV–2686 JOF (N.D.Ga.1993). Plaintiff then moved ex parte, without notice, in both courts for orders (1) restraining defendants from marketing or selling merchandise bearing the MA- CASE mark,[1] or from otherwise using the MACASE mark in any fashion; and (2) permitting plaintiff, pursuant to 15 U.S.C. § 1116(d), to seize any allegedly counterfeit merchandise and any business records related thereto.

---

1. The mark at issue is comprised of the word "Macase" in large, red capital letters next to a stylized "stacked cases" logo, which is formed by several black, tapered horizontal bars set atop one red horizontal bar and bounded on either side by black brackets. The mark is to be used in connection with computer cases, power supplies, and other related computer products.

On November 17, 1993, this Court met with plaintiff's counsel in chambers to discuss the propriety of such extraordinary relief as an unnoticed, ex parte seizure order. The Court was concerned because the only fact offered by Super Power in support of its conclusory allegation that it "owns the 'Macase' mark" was a representation that Super Power had filed an intent-to-use application with the United States Patent and Trademark Office on August 13, 1993. Mr. Hwu repeatedly assured the Court, however, that he was "experienced in trademark matters" and that a broad seizure order was warranted in cases "such as this." After considering Mr. Hwu's arguments, the Court refused to grant Super Power the broad relief which it sought, and issued instead a narrow TRO authorizing the plaintiff and the United States Marshals to enter Macase–Taiwan's California office and make a *copy* of a customer database that was allegedly stolen from Super Power by employees of Macase–Taiwan (the "California TRO").[2] At plaintiff's request, however, the Court agreed not to sign the California TRO until November 22 because Mr. Hwu represented to the Court that he was having difficulty arranging for service of the TRO by the Marshal's Office. The Court then gave plaintiff five days to serve Macase–Taiwan.

On November 19, the district court in Georgia denied a nearly identical ex parte, unnoticed motion pending before that court. In doing so, however, Judge J. Owen Forrester granted plaintiff leave to renew its motion once plaintiff supplied new factual and legal information.[3] After Super Power made this reapplication, the Georgia court issued on November 22 a TRO prohibiting defendant from using the trademark, trade name, or logo MACASE in any fashion, and authorizing seizure of all of defendant's inventory located at the Georgia office of Macase (the "Georgia TRO").[4]

2. In addition to the trademark claims, plaintiff's complaint alleged that Macase–Taiwan had lured away certain employees and had stolen confidential customer and price information from plaintiff.

3. Judge Forrester's order read as follows:

Pending before the court are applications for an *ex parte* temporary restraining order and seizure order. The court DENIES the applications.

It is apparent that there are one or more facts contained in the application that are incorrect. For example, it is alleged that Super Power has spent years developing good will for its mark, although Super Power is but a year old.

Further, it is not at all obvious to the court that the various affiants appeared in person before the notaries. There is an allegation that one of the individual defendants planted a virus in [p]laintiff's computer, and then he admitted that fact. The court has been unable to find the affidavit of the person who heard the defendant say it.

Beyond these matters, which leave the court with a certain feeling of insecurity about the factual predicate of the application, it is a fact that the court cannot determine that relief under the Lanham Act is available for an unregistered trademark.

If there is no registered trademark, the question arises concerning the power of the court to issue a seizure order under any common law or state law theories. This question is not addressed in the papers. Further, although the court realizes that a distributor may have a mark or a good which it does not manufacture, the court has some question about whether the manufacturer, Macase Industrial Corp., has an American common law mark by virtue of its presence in this country which seems to antedate the beginning of Super Power.

It is for these reasons that the court is denying the motion at this time. Leave is granted to renew the motion if these matters are addressed.

Order of 11/19/93, *Super Power Supply, Inc. v. Macase Indus. Corp.*, Case No. 93–CV–2686 JOF (N.D.Ga.1993).

4. There is some evidence that plaintiff's counsel misrepresented to the Georgia court the scope of the California TRO. At a subsequent hearing regarding plaintiff's application for a preliminary injunction, the following exchange occurred between Judge Forrester and Kevin Getzendanner, lead counsel for defendant:

MR. GETZENDANNER: I WANT TO APOLOGIZE IN OPEN COURT TO THE COURT AND MR. WEINSTOCK [associate counsel to Super Power in Georgia] BECAUSE OF THE IMPLICATION WHICH I CLEARLY WAS TRYING TO DRAW THAT THE COURT WAS NOT AWARE OF THE CALIFORNIA COURT'S ORDER.

THE COURT: I'M NOT.

MR. GETZENDANNER: OH.

THE COURT: THE CONVERSATION THAT YOU WERE A PART OF THE OTHER DAY ON THE TELEPHONE INDICATED THAT I HAD CLEARED THE WAY FOR THIS TO BE DONE ON FRIDAY. AND IT WASN'T. AND

Meanwhile, plaintiff failed to execute the California TRO within the five days allowed by this Court, and was forced to apply ex parte on November 24 (just before the Thanksgiving holiday weekend) for an extension of time so that it could serve the California TRO along with the broader Georgia TRO. In his ex parte application to this Court for an extension of time, Mr. Hwu represented by affidavit that (i) he had travelled to the Georgia district court on November 18, 1993, (ii) "due to his caseload," the district judge in Georgia "did not review plaintiff's ex parte application until November 24, 1993," and (iii) the district judge "granted plaintiff's request" for a TRO. Mr Hwu made these statements to this Court knowing that the Georgia court initially *denied* plaintiff's ex parte request on November 19, citing concerns regarding the accuracy of Super Power's factual allegations and the validity of its asserted legal authorities for the unnoticed TRO.

Even without knowledge of Mr. Hwu's creative interpretation of the Georgia court's rulings, this Court denied the application on November 30 because it believed that any alleged "service problems" were caused by nothing other than plaintiff's attorney's lack of diligence. Plaintiff refiled an ex parte, unnoticed application for a limited TRO with the Court on December 3, however, and the Court re-issued the California TRO on December 6 upon the condition that plaintiff serve the re-issued order within three days. Plaintiff then executed both the California TRO and the Georgia TRO simultaneously on December 8, 1993.

The first hearing regarding whether a preliminary injunction should issue was scheduled for Friday, December 10, in the Georgia court. Judge Forrester temporarily postponed this hearing, however, because Super Power's December 8 service of the Georgia TRO afforded defendant only two days' notice of the hearing. On December 13, the Georgia court held its preliminary injunction hearing, and, at that time, refused to issue a preliminary injunction, refused to release plaintiff's $100,000 corporate security bond, and ordered plaintiff to release all of the property seized from Macase–Taiwan's office in Georgia. Plaintiff voluntarily dismissed the Georgia action the next day.

Two days later, on December 16, the parties appeared before this Court for its hearing regarding whether a preliminary injunction should issue. At this hearing, for the first time, all of the pertinent facts relating to this case were placed before the Court. Although many of the details are bitterly debated by the parties, after reviewing the many declarations and exhibits submitted both in support of and in opposition to the various motions before the Court, the Court finds that certain facts are clear.

Macase Industrial Corp., a Taiwanese corporation, registered the MACASE trademark in Taiwan around 1989. On or about October 7, 1989, Macase–Taiwan first shipped computer cases and other equipment to the United States to be sold through a California distributor named Antec, Inc. ("Antec"). It was not until early 1991, however, that Macase–Taiwan began molding the name MACASE onto its computer cases. On or about February 14, 1991, Macase–Taiwan first shipped computer products bearing this mark to Antec. Although Macase–Taiwan continued to distribute its products in the United States through Antec until June 1992, it has had other domestic distributors as well. For example, during approximately six months between 1989 and 1991, Macase–Taiwan also sold its products through a California company called PC Care. According to affidavits submitted by Macase–Taiwan, the company's gross sales in the United States totalled approximately $300,000 in 1989, $3,500,000 in 1990, and $7,030,000 in 1991.

Macase–Taiwan has advertised its computer products in at least one computer magazine that is distributed in the United States, *Asian Sources Computer Products*, at various times since August 1989. By January

THE REASON THAT I CLEARED THE WAY FOR IT TO BE DONE ON A FRIDAY WAS A REPRESENTATION THAT THE COURT IN CALIFORNIA WAS ENTERING A LIKE ORDER, AND THAT THEY WANT [sic] TO BE EXECUTED AT THE SAME TIME. THAT'S THE LAST I HEARD. WE'RE IN RECESS. Hearing Transcript of 12/13/93, *Super Power Supply, Inc. v. Macase Indus. Corp.*, Case No. 93–CV–2686 JOF (N.D.Ga.1993), at 36–37.

1990, Macase–Taiwan's advertisements utilized the MACASE trademark in conjunction with the stylized "stacked cases" logo, and listed Antec as Macase–Taiwan's American distributor. The Macase–Taiwan/Antec ads continued to run in this publication until some time in 1991.

In March 1991, plaintiff Super Power was formed by a family friend of one of the principals of Macase–Taiwan. Macase–Taiwan agreed to support Super Power by sharing Super Power's costs of promoting Macase products in the United States, by extending special 75–day credit terms, and by arranging and paying for ads to be placed in *Asian Sources Computer Products* magazine that would list Super Power as Macase–Taiwan's U.S. distributor.[5] Although plaintiff's officers contend that Super Power was to be a "joint venture ... to distribute computer equipment ... in the United States," Macase–Taiwan denies this characterization. Instead, Macase maintains that it never transferred any ownership interest in the MACASE mark or logo to Super Power,[6] nor did it ever directly invest money in Super Power. In any event, this business arrangement originally was mutually satisfactory to the parties because, as of December 1992, Super Power had become Macase–Taiwan's largest distributor in the U.S., accounting for approximately 90% of the company's U.S. sales.[7]

By July 1993, however, Super Power's account with Macase–Taiwan was approximately $265,000 past due. Macase–Taiwan notified Super Power that it would not release any additional product unless this amount was paid. Super Power filed suit in state court seeking to obtain release of this shipment, but that suit was dismissed once Macase–Taiwan agreed to turn the shipment over in exchange for a cash payment. Later, in August 1993, Macase–Taiwan again refused to release a shipment of goods because Super Power's accounts were once more past due. Super Power sought relief in the state court a second time. Pursuant to a September 1993 settlement agreement, though, Macase–Taiwan voluntarily released the products in exchange for another cash payment and a promise from one of Super Power's principals that he would not attempt to register a corporation named "Macase Industrial U.S.A., Inc."

After this falling out, Macase–Taiwan decided not to do any more business with Super Power. On or about July 21, 1993, Macase–Taiwan incorporated in Georgia a wholly-owned subsidiary, Macase–Georgia. Macase–Taiwan then incorporated another subsidiary-distributor called Imagecase Designer and Manufacturer, Inc. ("Imagecase") in California. Macase–Georgia's first sale of products bearing the MACASE mark occurred on August 26, 1993. By November 1993, Macase–Georgia's sales totalled approximately $400,000 per month. Defendant also contends that Imagecase had projected sales of $450,000 for the month of December

---

**5.** As a side note, although Super Power summarily alleged in its complaint that Macase–Taiwan had "stolen" several of its employees, Macase–Taiwan's declarations tell a different story. Apparently, Macase–Taiwan's president sent approximately five Macase employees to the United States to work for Super Power in an effort to support the fledgling company. For the first three months that these employees were working for Super Power, their salaries were paid by Macase–Taiwan. Macase–Taiwan also paid for all transportation and insurance costs for these employees. In fact, several of these individuals are the ones identified by plaintiff as having been "lured away" from Super Power's office.

**6.** Macase–Taiwan does admit that at some point it collaborated with Super Power in making some "slight" modifications to the existing MACASE logo for purposes of using the mark in Super Power's advertising, but those changes appear to be nothing more than a rearrangement of the elements comprising prior versions of the MACASE mark. Only a few decorative lines underscoring the word "Macase" were removed from Macase–Taiwan's original version of the mark, and the words "Designer and Manufacturer" were added at the bottom of the logo. In all other respects, including the "stacked cases" logo, the two marks are virtually identical.

**7.** Macase–Taiwan's first shipment of computer cases bearing the MACASE logo to Super Power occurred in July 1991. At the time of this shipment, however, Macase was still distributing approximately 70% of its product through Antec. In fact, through the first half of 1992, approximately 60% of Macase's U.S. sales were through Antec, whereas only 31% were through Super Power. It was not until the second half of 1992 that Macase ceased dealing with Antec.

before the execution of the TROs essentially shut down its American operations.

On August 16, 1993, Super Power filed an intent-to-use application regarding the MACASE mark with the U.S. Patent and Trademark Office. According to Super Power's application, as of August 13, 1993, it had yet to use its version of the disputed mark in commerce. On August 23, 1993, Macase–Taiwan filed a use-based application for registration of the MACASE trademark. Although that application currently indicates that Macase–Taiwan first used the mark in commerce on November 11, 1992, Macase–Taiwan represents to the Court that it plans to file an amendment to this application claiming August 1989 as the date of first use.

## II. JURISDICTION

■ Plaintiff voluntarily dismissed the action formerly pending in this Court the day after the Court denied Super Power's application for a preliminary injunction. This tactic does not bar the Court from further reviewing counsel's actions in this matter, nor does it prevent the Court from issuing an order related to rulings made from the bench during the December 16, 1993 hearing. *See, e.g., Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 395–98, 110 S.Ct. 2447, 2455–57, 110 L.Ed.2d 359 (1990); *Orange Prod. Credit Ass'n v. Frontline Ventures Ltd.,* 792 F.2d 797, 801 (9th Cir.1986); *Trohimovich v. Commissioner,* 776 F.2d 873, 875 (9th Cir.1985). Moreover, neither party has objected to the Court ruling on the matters at issue herein.

## III. PRELIMINARY INJUNCTION

■ In order to qualify for a preliminary injunction in the Ninth Circuit,

the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. These are not two distinct tests, but rather the opposite ends of a single "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness."

*Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987) (quoting *San Diego Comm. Against Registration & the Draft v. Governing Bd. of Grossmont Union High Sch. Dist.,* 790 F.2d 1471, 1473 n. 3 (9th Cir.1986)) (other citations omitted); *see Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 612 (9th Cir.1989). In this case, Super Power can meet neither test.

■ First, even assuming that there is irreparable harm to reputation in trademark cases, *see In re Vuitton et Fils S.A.,* 606 F.2d 1, 4 (2d Cir.1979); *Earth Tech. Corp. v. Environmental Research & Tech., Inc.,* 222 U.S.P.Q. 585, 587, 1984 WL 877 (C.D.Cal. 1983), plaintiff has not sufficiently demonstrated a likelihood of success on the merits of either its state or federal claims. Among other things, Super Power failed to demonstrate any factual or legal basis for its assertion that it owns the mark at issue or that it has used the mark in commerce.[8] Such proof is a prerequisite to a valid trademark action. *See, e.g., General Conf. Corp. of Seventh–Day Adventists v. Seventh–Day Adventist Congregational Church,* 887 F.2d 228, 231 (9th Cir.1989), *cert. denied,* 493 U.S. 1079, 110 S.Ct. 1134, 107 L.Ed.2d 1039 (1990). In stark contrast, Macase–Taiwan represents to the Court that it first used the MACASE mark in 1989, and first shipped goods bearing the mark to the United States

---

**8.** At best, Super Power wants the Court to infer definitive ownership from the fact that it filed an intent-to-use ("ITU") application on August 13, 1993. The Court declines to do so because only actual use of a mark in commerce results in ownership rights. *See, e.g.,* 15 U.S.C. §§ 1051, 1072; *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 815–16 (1st Cir.1987); *Omega Nutrition U.S.A., Inc. v. Spectrum Mktg., Inc.,* 756 F.Supp. 435, 438 (N.D.Cal.1991). Moreover, as noted above, the facts before the Court tend to indicate that defendant Macase–

Taiwan is actually the owner of the mark: Macase has existed far longer than plaintiff, Macase bears the disputed word mark as part of its name, and Macase has at least introduced some evidence of actual use in commerce of the MACASE mark. In the face of such compelling contrary evidence, the ITU application is virtually irrelevant. *See, e.g., Windows User, Inc. v. Reed Bus. Publishing Ltd.,* 795 F.Supp. 103, 107–08 (S.D.N.Y.1992); *Fila Sport S.p.A. v. Diadora Am., Inc.,* 141 F.R.D. 74, 75 (N.D.Ill.1991).

on February 14, 1991. Super Power did not even exist until March 1991, and appears to be nothing more than a disgruntled distributor. Absent a specific agreement to the contrary, a distributor does not acquire any rights to a manufacturer's trademark. *See, e.g., Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1563 (11th Cir. 1991); *Roger & Gallet v. Janmarie, Inc.*, 245 F.2d 505, 509, 510 (C.C.P.A.1957); *Safe-T Pac. Co. v. Nabisco, Inc.*, 204 U.S.P.Q. 307 (T.T.A.B.1979); *In re Eucryl, Ltd.*, 193 U.S.P.Q. 377 (T.T.A.B.1976). Macase has also proffered to the Court numerous facts that similarly call Super Power's state law claims into question.

Turning to the alternative formulation of the Ninth Circuit test, it would be difficult to find that serious questions exist regarding the merits of plaintiff's claims. As noted above, Macase–Taiwan has introduced substantial evidence indicating that it is in fact the owner of the mark: it first sold products bearing the MACASE mark—or a mark that is nearly indistinguishable therefrom—in the United States in February 1991, and this sale occurred before Super Power existed. Moreover, as early as 1989, Macase–Taiwan also utilized the mark in advertising placed in a magazine which is widely read by U.S. computer purchasers. *See, e.g., New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1199–1200 (9th Cir.1979) (holding that even promotional or advertising use which does not constitute strict trademark use can establish priority in a mark).

Even if the Court were to find that serious questions exist regarding the ownership of the mark, however, Super Power has not shown that it will suffer an injury which is not compensable with money damages. As the Court informed plaintiff's counsel when he applied ex parte for the TRO and seizure order, this does not appear to be a case involving counterfeiting; Macase–Taiwan is itself selling through its own subsidiaries the exact same goods that it used to sell to Super Power. Despite plaintiff's protestations to the contrary, such sales appear to pose little,

if any, threat to the goodwill associated with the MACASE mark or to the quality of the goods sold under that mark. *See, e.g., Yamaha Corp. of Am. v. ABC Int'l Traders Corp.*, 703 F.Supp. 1398, 1401–03 (C.C.Cal.1988), *aff'd in relevant part*, 940 F.2d 1537 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992). Thus, the only injury to Super Power that results from defendant's continued business activities would be lost sales. Had this case gone to trial, and had plaintiff prevailed, Super Power's lost sales could easily have been established by reference to defendant's books.

Finally, if the balance of the hardships tips in anyone's favor, it tips in favor of Macase–Taiwan. First, as noted above, the evidence indicates that Macase–Taiwan appears to be the owner of the mark, a fact which tends to show that it is *Super Power's* continued use of the MACASE mark which would damage any goodwill associated with that mark. Second, Macase–Taiwan has made substantial sales in the United States prior to and during Super Power's tenure as Macase's distributor. Because Super Power was previously the sole U.S. distributor of products manufactured by Macase–Taiwan, Macase currently has no way to distribute its product here except through its fledgling U.S. subsidiaries. Macase–Georgia has already been shut down for a period of time as a result of plaintiff's actions in the Georgia district court, thereby causing Macase–Taiwan to lose sales during what appears to be one of the busiest sales months in the computer industry. The Georgia court has since lifted its injunction, and Super Power has given this Court no good reason why such a hardship should be reimposed on Macase.

## IV. IMPOSITION OF SANCTIONS

 Rule 11 of the Federal Rules of Civil Procedure imposes several obligations on persons appearing in federal courts:[9]

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other

---

9. Although the version of Rule 11 quoted herein did not become effective until December 1, 1993, the differences between the current version of the rule and its predecessor do not materially affect the Court's analysis of plaintiff's counsel's conduct in this case.

paper, an attorney ... is certifying that to the best of [his] knowledge, information, and belief, formed after reasonable inquiry under the circumstances

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information and belief.

Fed.R.Civ.P. 11(b); *see also* Local Rule 27.-1.[10] A finding of actual "bad faith" is not necessary to impose sanctions under Rule 11. *Orange Prod. Credit Ass'n v. Frontline Ventures Ltd.,* 792 F.2d 797, 800 (9th Cir.1986). Sanctions are appropriate "when a pleading which has been filed 'is frivolous, legally unreasonable, or without factual foundation.'" *Id.* (quoting *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 831 (9th Cir.1986)); *accord Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990).

> Similarly, 28 U.S.C. § 1927 provides that

> [a]ny attorney or other person admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case as to increase costs unreasonably and vexatiously may be required by the court to satisfy personally such excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

The term "unreasonably and vexatiously" in Section 1927 has been defined as "an intentional departure from proper conduct or, at a minimum, ... a reckless disregard of the duty owed by counsel to the court." *United States v. Ross,* 535 F.2d 346, 349 (6th Cir. 1976); *accord Estate of Blas v. Winkler,* 792 F.2d 858, 860 (9th Cir.1986).

█ Where such extraordinary relief as an unnoticed, ex parte seizure order is sought, the Court necessarily relies upon the diligence, honesty, and forthrightness of the represented party's counsel to ensure that the rights of the unrepresented party are not unduly infringed. *Cf., e.g., Business Guides, Inc. v. Chromatic Communications Enters., Inc.,* 498 U.S. 533, 546, 111 S.Ct. 922, 930, 112 L.Ed.2d 1140 (1991). The conduct of plaintiff's counsel in this case violates both the spirit and the letter of Fed.R.Civ.P. 11, not to mention the terms of 28 U.S.C. § 1927. Sanctions are therefore appropriate because (i) Mr. Hwu should have known after a reasonable investigation of the facts that he had little cause to seek a preliminary injunction, and no basis whatsoever upon which to seek unnoticed, ex parte relief; (ii) Mr. Hwu intentionally misrepresented certain facts to the Court; and (iii) Mr. Hwu was dilatory in rectifying his mistakes and omissions once they were made known to him. *See, e.g., Cooter & Gell,* 496 U.S. at 393, 110 S.Ct. at 2454.

█ Initially, even assuming that Super Power's representatives failed to inform Mr. Hwu of facts unfavorable to their claims, Mr. Hwu should have known that he had insufficient information upon which to premise a request for an unnoticed seizure order under 15 U.S.C. § 1116(d). When Super Power's original ex parte application for a TRO was heard by the Court in chambers, the Court expressed grave doubts over whether Mr. Hwu had alleged facts sufficient to create an inference that this was a case involving counterfeiting. Mr. Hwu, who claims to have extensive experience in the trademark field, could not have had a good faith belief, after

---

10. Local Rule 27.1 provides that a "violation of or failure to conform to any of ... the F.R.Civ.P. ... shall subject the offending party or counsel to such penalties, including monetary sanctions and/or the imposition of costs and attorneys' fees to opposing counsel, as the Court may deem appropriate under the circumstances."

reasonable inquiry, that a declaration stating "I own the mark" or an intent-to-use application would be sufficient proof of ownership to create a likelihood of success on the merits—or, alternatively, to demonstrate the existence of a serious question and a favorable balance of hardships—where the defendant company pre-existed plaintiff and bears the word mark at issue as its name. When proceeding against such a defendant, Mr. Hwu should have known that he had to allege that his client first used the mark in question in commerce, had purchased the mark in question, or had some other *factual* basis for his client's claim of ownership rights; conclusory statements in a declaration will not suffice when the defendant is an apparent prior user.[11] Moreover, in light of the fact that Mr. Hwu was seeking *unnoticed* ex parte relief, he should have provided sufficient facts—not speculative opinion—to support an inference that Macase–Georgia or Imagecase were "fly by night" operators who would pack up their inventory and flee the jurisdiction if they were properly served with notice of plaintiff's intent to seek a TRO and seizure order. *See* Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. 31673, 31678 (1984);[12] *cf., e.g., In re Vuitton et Fils S.A.*, 606 F.2d 1, 4–5 (2d Cir.1979).

Although the Court might have been inclined to overlook what may have been merely Mr. Hwu's slipshod investigation of the underlying facts, it was difficult to do so once the Court discovered that Mr. Hwu apparently attempted to conceal other material facts. When plaintiff's counsel applied ex parte for an extension of time in which to serve the California TRO, for example, he failed to fully inform the Court of the Georgia court's actions and his true reasons for needing an extension of time. This misrepresentation was both material and intentional. First, Mr. Hwu should have disclosed the Georgia court's concerns upon re-application to this Court because the California TRO was based upon the *same papers that the Georgia court had rejected as insufficient.* Second, by representing to this Court that the Georgia court's delay was "due to the district judge's caseload," Mr. Hwu thereby actively concealed the fact that the delay was due instead to that court's concerns about the merits of his client's case.

Finally, the manner in which Mr. Hwu prosecuted this action vexatiously multiplied the costs of this litigation. After both the California TRO and the Georgia TRO were served, the parties commenced expedited discovery in preparation for the December 13 preliminary injunction hearing in the Georgia district court. Prior to that hearing, Mr. Hwu should have had enough information at his disposal to apprise him of the exceedingly weak nature of his client's case. Yet, despite this knowledge, he continued to prosecute his applications for a preliminary injunction in the Georgia court and again, two days later, in this Court. At the very least, Mr. Hwu should have withdrawn or modified his applications for a preliminary injunction once he was aware of the facts.[13] This, of course, is in addition to the fact that Mr. Hwu wasted a

---

11. Mr. Hwu does not assert—nor can he—that he made a reasonable investigation of the facts "under the circumstances." Inasmuch as it took plaintiff's counsel over a month to obtain and serve a valid TRO—i.e., from November 9, 1993 to December 8, 1993—it is unlikely that an extra week or two of diligent investigation would have prejudiced Super Power.

12. Congress' intent in enacting 15 U.S.C. § 1116(d) is unambiguous:
The sponsors wish to emphasize that ex parte seizures are to be ordered only as a last resort. It would not be appropriate to order such a seizure against a reputable merchant, absent unusual circumstances—such as when the applicant can make a particularized showing that the merchant would be likely to defy a court order to maintain the status quo. A reputable businessperson would not be likely to conceal

or destroy evidence when notified of a pending lawsuit.... Rather, the sponsors believe that ex parte seizures are a necessary tool to thwart the bad faith efforts of fly by night defendants to evade the jurisdiction of the court.
*Id.* at 31678.

13. It should be clear that the Court is *not* sanctioning plaintiff's counsel for his pursuit of a limited TRO and seizure order for the allegedly purloined customer information database. The Court does not dispute that there may have been a sufficient factual basis to justify Mr. Hwu seeking such relief on Super Power's behalf. However, this does not entitle Mr. Hwu to seek other remedies to which he should know his client is not entitled, nor does it privilege him to misrepresent material facts to the Court.

good deal of this Court's time with his repeated failure to arrange for expeditious service of the ex parte, unnoticed temporary restraining orders.

■ Defendant Macase–Taiwan requests that the Court award sanctions in the amount of $57,267.45, a sum that represents the defendant's attorneys' fees and expenses incurred in defending against Super Power's application for a preliminary injunction. It is certainly within the Court's discretion to award such an amount. But, because a sanctions award should be "reasonable," the Court must examine (i) whether such an award will deter future misconduct by plaintiff's counsel; (ii) whether the fees charged by defense counsel "were reasonably necessary to resist the offending action"; (iii) the extent to which defendant could have mitigated its fees and expenses; and (iv) whether defense counsel somehow "provoked" the sanctionable conduct. *In re Yagman*, 796 F.2d 1165, 1183–85 (9th Cir.1986), *cert. denied*, 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987).

Initially, the Court looks to the factors enumerated in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976),[14] to determine whether the defendant reasonably incurred $57,267.45 in attorneys' fees. *See Yagman*, 796 F.2d at 1185. Although the total amount is not an unreasonable fee under the circumstances,[15] defendant is not entitled to full reimbursement for these expenditures. Many of the tasks performed, in whole or in part, would have been necessary to defend against a preliminary injunction aimed solely at the allegedly misappropriated customer information database, and it was not unreasonable under the circumstances for Mr. Hwu to have sought such limited relief for his client. The Court therefore awards sanctions of $15,000.00, an amount that reflects the portion of fees incurred for reviewing plaintiff's arguments and exhibits regarding the trademark issues, researching relevant Ninth Circuit authority on the trademark issues, taking expedited discovery on the trademark issues, drafting declarations for use in this Court's preliminary injunction hearing, and appearing before this Court. An award of $15,000.00 also more accurately reflects the extent of Mr. Hwu's culpability, as well as his ability to pay.[16] *See id.*

After careful consideration of the matter, there is no doubt in the Court's mind that

**14.** These factors are:
 (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.
 *Kerr*, 526 F.2d at 70.

**15.** After being served on December 8, 1993, defense counsel had five days to prepare for the preliminary injunction hearing in Georgia, and eight days to prepare for the hearing in this Court. In that time, counsel had to (i) find associate trial counsel in a foreign jurisdiction; (ii) review and analyze the substantial pleadings filed by Super Power in both actions; (iii) hold extensive meetings with the various defendants, including long-distance communications with the president of Macase–Taiwan in Taipei, to ascer-

tain the merits (or lack thereof) of Super Power's claims; (iv) take and defend four depositions during a three-day period of expedited discovery; (v) interview several third-party witnesses; (vi) prepare and arrange for the execution of the declarations necessary to support Macase's opposition to Super Power's applications for a preliminary injunction; (vii) research and draft memoranda in opposition to those applications (containing the appropriate law of each jurisdiction); (viii) retain a private investigator to examine whether Super Power itself was guilty of improper business activities; and (ix) prepare for oral argument before both courts. The fees charged for these services, ranging between $90–$225 per hour, were reasonable given the experience of counsel, the complexity of the trademark issues involved, and the number of tasks to be performed in such a short period of time.

**16.** The Court need not consider the remaining *Yagman* criteria, i.e., whether Macase–Taiwan's attorneys provoked Mr. Hwu's misconduct or whether Macase's counsel might have mitigated their expenses. The record is bereft of any indication of wrongdoing on defense counsel's part, and the staffing and services provided in this matter were reasonable under the circumstances.

this sanction is just.[17] Because the award follows relatively swiftly on the heels of Mr. Hwu's unreasonable conduct, and involves by no means a trivial amount, it properly serves Rule 11's goal of deterring similar misconduct in the future. The amount is also appropriate under the circumstances, insofar as it tracks the damage caused by counsel's objectionable behavior. Finally, because the Court's sanction roughly approximates the "excess costs, expenses, and attorneys' fees" occasioned by Mr. Hwu's reckless conduct, it falls squarely within the terms of Section 1927.

## V. ORDER

For the reasons stated herein,

IT IS HEREBY ORDERED that, consistent with the Court's Tentative Ruling of December 16, 1993, the TRO and seizure order be dissolved with the exception of the confidentiality provisions therein, the request for a preliminary injunction be denied, and plaintiff's $5,000 bond be held in the event that defendant suffered damages from the execution of the TRO and seizure order. Moreover, IT IS FURTHER ORDERED that Peter S. Hwu, Esq., shall pay to defendant Macase Industrial Corp., as a sanction under Fed.R.Civ.P. 11, Local Rule 27.1, and 28 U.S.C. § 1927, the sum of $15,000.00, as partial reimbursement of defendant's attorneys' fees and expenses incurred in defending against plaintiff's overly broad application for a preliminary injunction.

---

**17.** Although it is also within the Court's discretion to impose sanctions jointly on Super Power, *see Business Guides*, 498 U.S. at 545–47, 111 S.Ct. at 930–31, the Court is not convinced that Super Power was at fault. First, Super Power probably was not in a position to evaluate the legal sufficiency of the affidavits submitted in support of its trademark claims—that was Mr. Hwu's responsibility. Second, there is no evidence that Super Power influenced the tactical decisions made by Mr. Hwu. In the absence of evidence of wrongdoing on the client's part, sanctions against the client would be inappropriate. *See id.* at 550–51, 111 S.Ct. at 932–33.